222 N.J. Super. 175 (1988)
536 A.2d 311
CPS CHEMICAL COMPANY, INC., A CORPORATION OF THE STATE OF NEW JERSEY AS SUCCESSOR TO CPS PROCESSING CORPORATION, A CORPORATION OF THE STATE OF NEW JERSEY, CPS CHEMICAL CORPORATION, A DIVISION OF CHEMICAL & POLLUTION SCIENCES, INC., A CORPORATION OF THE STATE OF NEW JERSEY, CPS RESEARCH CORP., A CORPORATION OF THE STATE OF NEW JERSEY, EDWARD TRUEGER & COMPANY AND CHEMICAL AND POLLUTION SCIENCES, INC., A CORPORATION OF THE STATE OF NEW JERSEY, PLAINTIFFS-APPELLANTS,
v.
THE CONTINENTAL INSURANCE COMPANY, A CORPORATION OF THE STATE OF NEW YORK, UNITED STATES FIDELITY AND GUARANTY COMPANY, A CORPORATION OF THE STATE OF MARYLAND, DEFENDANTS-RESPONDENTS, AND GEORGE S. WHITE & COMPANY, INC., A CORPORATION OF THE STATE OF NEW JERSEY, MICHAEL L. RODBURG, ESQ. AND LOWENSTEIN, SANDLER, BROCHIN, KOHL, FISHER, BOYLAN AND MEANOR, A PROFESSIONAL CORPORATION, DEFENDANTS.
Superior Court of New Jersey, Appellate Division.
Argued November 30, 1987.
Decided January 15, 1988.
*176 Before Judges PETRELLA, DREIER and BAIME.
Michael F. Chazkel argued the cause for appellants (Michael F. Chazkel, attorney, and on the brief).
Charles Thomason argued the cause for respondent Continental Insurance Company (Wilson, Elser, Moskowitz, Edelman & Dicker, attorneys; Charles Thomason on the brief).
David G. Lucas, Jr. argued the cause for respondent United States Fidelity and Guaranty Company (Wolff, Helies & Duggan, attorneys; David G. Lucas, Jr., on the brief).
Smith, Stratton, Wise, Heher & Brennan filed a brief amicus curiae for Insurance Environmental Litigation Association (William J. Brennan, III on the brief; Piper & Marbury of counsel; Thomas W. Brunner and Laura A. Foggan on the brief).
*177 Kerby, Cooper, Schaul & Garvin filed a brief amici curiae for Chemical Manufacturers Association, International Business Machines Corporation, Olin Corporation, Owens-Corning Fiberglas Corporation, Richardson-Vicks, Inc., Stauffer Chemical Company and Westinghouse Electric Corporation (Jerry F. English on the brief; Covington & Burling of counsel; Robert N. Sayler, John G. Buchanan, III and William F. Greaney on the brief).
The opinion of the court was delivered by BAIME, J.A.D.
Pursuant to R. 2:2-4, we granted plaintiff CPS Chemical Company's (CPS)[1] motion for leave to appeal from a partial summary judgment entered by the Superior Court, Law Division, in favor of defendants United States Fidelity and Guaranty Company (USF & G) and The Continental Insurance Company (Continental). The trial judge held that USF & G and Continental were not required under the terms of their comprehensive general liability insurance policies to indemnify CPS for monetary amounts awarded to the New Jersey Department of Environmental Protection (DEP) and the City of Perth Amboy (City) in two consolidated lawsuits. In the underlying litigation, CPS had been found legally obligated under the Spill Compensation and Control Act (N.J.S.A. 58:10-23.11 et seq.) (Spill Act) and the Water Pollution Control Act (N.J.S.A. 58:10A-1 et seq.) (WPCA) to pay the cost of cleaning up environmental contamination caused by the discharge of toxic chemicals from its plant in Old Bridge Township, New Jersey. The amounts awarded to the DEP and the City were to be expended in accordance with the terms of the final order which set forth a detailed plan designed to restore a nearby tributary known as Prickett's Brook and ground water beneath the *178 adjacent Runyon well field, which is operated by the City as a source of potable water for surrounding communities. In granting summary judgment in favor of USF & G and Continental, the trial court determined that the relief granted in the underlying lawsuits was essentially equitable in nature and that the monetary amounts awarded to the DEP and the City did not constitute damages subject to the carriers' respective obligations of indemnification.
For the purpose of this appeal, the salient facts are not in dispute and are essentially a matter of public record. CPS is engaged in the processing, treatment and storage of alcohols, esters and other organic compounds. These operations, which are extensive, are conducted at CPS's plant in Old Bridge Township. On March 16, 1977, the City of Perth Amboy filed a civil action against CPS and five other defendants[2], alleging that they were liable in tort for property damage caused by their discharge of organic compounds from their respective factories and plants. More specifically, the City claimed that CPS and others, through the negligent operation of their facilities, discharged harmful and toxic chemicals, which ultimately found their way into the Prickett's Brook watershed and the Runyon well field, thereby completely contaminating its water supply. On the basis of these allegations, the City sought monetary damages, interest and costs of suit.
On August 4, 1977, the DEP instituted a separate action against CPS and Madison Industries, Inc. (Madison), asserting claims under the Spill Act and the WPCA. In the complaint, it was alleged that the Prickett's Brook watershed and the Runyon well field had been contaminated with toxic chemicals used by CPS and Madison in their respective operations. Accordingly, the DEP asserted that CPS and Madison were strictly liable for the costs to be incurred in restoring the watershed and the *179 well field. As emphasized by both USF & G and Continental, the relief requested by the DEP was framed in terms of a mandatory injunction directing CPS and Madison "to institute a cleanup plan," "to implement all necessary measures to prevent the discharge of any further hazardous substances," and "to install and maintain monitoring wells ... at the plant site." In addition, the DEP sought monetary damages, costs and penalties under the Spill Act, the Pollution and Obstruction of Waters Act (N.J.S.A. 23:5-29) and the Environmental Rights Act (N.J.S.A. 2A:35A-1 et seq.).
On October 28, 1977, an order was entered consolidating the two actions for the purposes of discovery and a trial on the merits. Following a protracted non-jury trial, the judge found that "organic chemical emissions from CPS were the competent producing cause of chemical pollution of the Runyon well field...." The judge further determined that the discharge of chemicals from the plants operated by CPS and Madison had severely contaminated the City's water supply. However, the judge rejected the remedy proposed by the City, which was to abandon the watershed and collect damages for the permanent loss of its property and for the loss of the water itself. Instead, the judge found that the watershed and the well field could be restored over a period of time by the use of certain experimental remedial methods available under current technology, as proposed by the DEP.
The judgment ultimately entered in favor of the City and the DEP provided for the award of 5.2 million dollars, to be used for (1) the construction and operation of a "slurry cutoff wall" three to five feet thick comprised of an impermeable substance, surrounding the CPS and Madison plant sites at their boundaries to a depth of approximately 70 feet and anchored in the South Amboy fire clay layer underlying the acquifer, (2) the installation of four maintenance wells within the slurry cutoff wall, four decontamination pump wells beyond the slurry cutoff wall, and monitoring wells to determine contamination levels, (3) the diversion of Prickett's Brook to a new channel, thereby *180 bypassing the two industries and (4) the dredging, pumping and disposing of contaminated sediments found in Prickett's Pond. Under the judgment, $1,700,000 was awarded to the DEP for installation of the monitoring wells and decontamination wells, pumping one million gallons of water per day for four years, $583,000 was awarded to the DEP to be used for the rerouting of Prickett's Pond, $585,000 was awarded to the City against Madison for dredging heavy metal sediments from Prickett's Pond and $430,000 was awarded to the City against CPS, representing the estimated cost of removing organic chemicals from the Pond. In addition, $100,000 was awarded to the City for the loss of the beneficial use of the Prickett's Brook watershed for a four-year period.
The judgment was apportioned between CPS and Madison in accordance with specified formulas set forth in the court's order. Specifically, the cost of the slurry cutoff wall was to be borne by CPS and Madison in proportion to the area enclosed within their respective industrial sites. The cost of construction and operation of the wells and the diversion of Prickett's Brook was to be shared equally by the two companies. The cost of pumping water from Prickett's Pond was assessed against CPS. The dredging of the pond was to be paid for by Madison. Each company was held to be only severally liable for its share of the total costs for the corrective measures. CPS and Madison were held to be jointly and severally liable to the City for the $100,000, which, as we have noted, represented damages for the loss of the watershed during the four years projected duration of the cleanup operation.
In an unpublished per curiam opinion, we sustained the factual and legal determinations made by the trial judge, but modified the judgment in two particulars. First, while recognizing that, under common law tort principles, damages for harm are generally to be apportioned among defendants in accordance with the extent to which each has contributed to the resulting injury, we found that the contamination of the watershed and well field was indivisible and thus CPS and Madison *181 should be held jointly and severally liable for the costs of the curative measures designed to combat the condition they created. Consequently, we imposed joint and several liability for payment of all amounts awarded to the DEP for implementation of the measures specified in the judgment. Second, we determined that the 5.2 million dollar sum might ultimately prove to be grossly inadequate to implement the ordered remedies. We noted that under the Spill Act and the WPCA, the court is empowered to order that all costs to abate water pollution be paid by those adjudged liable for violating the law. We pointed out that an accurate assessment of the prospective cost of the cleanup program was not possible, considering the unknowns to be encountered in the course of employing the untried, innovative technology required in toxic waste removal plans. In light of these uncertainties, we held that CPS and Madison should be obligated to pay all costs actually incurred by the DEP in implementing the remedies ordered by the trial court, and not limited to the amounts expressly imposed in the order and judgment.
Following the rendition of our opinion and the denial of certification by the Supreme Court, CPS filed this action, seeking a declaration that USF & G and Continental were contractually obliged under the terms of their respective liability policies to pay all defense costs incurred in the underlying litigation, and to indemnify it for the pecuniary amounts awarded against it in the consolidated proceedings. Both carriers denied liability on the basis that the sum of money for which CPS was adjudged liable did not constitute pecuniary damages and thus did not fall within the policy coverage. Because resolution of the issues presented at the trial level, and now on appeal, hinges upon our interpretation of the policy language, we recite the relevant provisions verbatim. The preprinted, standardized insuring clauses contained in the policies required USF & G and Continental:
[to] pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages because of

*182 A. bodily injury or
B. property damage
to which this insurance applies, caused by an occurrence....
The policies define "property damage" as:
... (1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use at any time resulting therefrom, or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period.
The policies define "occurrence" as:
... an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the Insured.
All parties filed cross-motions for summary judgment. On February 27, 1987, the trial judge (not the judge who presided in the underlying litigation) rendered an oral opinion in which he concluded that the sums of money CPS was legally obligated to pay the DEP under the judgment were not recoverable under the USF & G and Continental policies. In a subsequent written order, the judge explained his oral holding by stating that the financial liabilities imposed on CPS in the underlying action were "not to compensate for property damage sustained." Rather, the monetary amounts to be paid to the DEP were said to constitute "costs to effect changes in systems and conditions that existed at and around the CPS plant."[3] Partial summary judgment was entered in favor of USF & G and Continental.
We reverse. We hold that monetary amounts awarded to the DEP for the purpose of implementing measures designed to abate the continued migration of hazardous wastes into the Prickett's Brook watershed and the Runyon well field in order to restore the acreage and water to their natural condition prior to the unlawful discharge constitute damages subject to the *183 carriers' obligation of indemnification. Because genuine issues of fact exist concerning the exact nature of the costs to be borne by CPS under the judgment, we are constrained to remand the matter for a plenary hearing.

I.
The principal thrust of the argument advanced by USF & G and Continental, both at the trial level and on appeal, is that the monetary amounts assessed against CPS and awarded to the DEP were merely ancillary to the essentially injunctive relief directed by the trial court in its judgment in the underlying litigation, and, therefore, do not constitute damages within the meaning of the policy language. We disagree.
In Broadwell Realty v. Fidelity & Cas., 218 N.J. Super. 516 (App.Div. 1987), we recently had occasion to consider and reject a similar argument. There, we held that the cost of abatement measures taken by the insured in response to a DEP directive designed to halt the continued migration of hazardous and toxic wastes onto adjacent lands was recoverable under the terms of a comprehensive liability insurance policy. Id. at 525-530. As here, the insurance contract in Broadwell required the carrier to indemnify the insured for all sums which the latter "shall become legally obligated to pay as damages because of property damage ... caused by an occurrence." Id. at 525. Quoting from the decision of our Supreme Court in Weedo v. Stone-E-Brick, Inc., 81 N.J. 233, 237 (1979), we noted that "[t]his is the standard language found in the great majority of [comprehensive general liability policies] written in this country." 218 N.J. Super. at 525. Interpreting the identical phrase which appears in the USF & G and Continental policies, we stressed that the insurer's obligation to indemnify the insured was "not confined to the payment of pecuniary damages to a third party measured solely by the diminution in value of the property caused by the covered destructive incident or event." Id. at 526. Rather, we emphasized that "[b]y its very terms, the *184 policy mandate[d] indemnification for `all sums which the insured shall become legally obligated to pay as damages because of ... property damage....'" Ibid. (Emphasis in original). Noting that the "harm to the State, by reason of the discharge of pollutants into its streams, and to others was continuing and ongoing," id. at 527-528, and that "[f]urther peril was both imminent and immediate," id. at 528, we stated that "the policy [did] not require the parties to calmly await further catastrophe." Id. at 526. Under such circumstances, we held that the cost of abatement measures designed to prevent the continued destruction of adjacent property was compensable under the policy. Id. at 526.
USF & G and Continental do not quarrel with much of what was said in Broadwell. They concede, as they must, that their obligation to indemnify the insured is not limited to payment of amounts measured solely in terms of the diminution in value of the land of third parties caused by occurrences covered under their respective policies. The essential point they urge, however, is that injunctive relief is not encompassed in claims for damages for which they are required to indemnify their insured. We addressed this question in Broadwell. In the course of our opinion, we recognized that "the insurance contract covers only payments to third persons when such individuals have a legal claim for damages against the insured on account of injury or destruction of property." Id. at 527. We also acknowledged that "the word `damages' generally refers to a pecuniary compensation or indemnity, see Black's Law Dictionary 499 (3d ed. 1933), and that the cost of complying with an injunctive decree does not ordinarily fall within this definition." Id. at 527. Having said this, we nevertheless emphasized that "[t]he insured's expenditures were made to discharge its legal obligation to the DEP...." Ibid. To that extent, we found that "[t]he expenses were incurred by virtue of the in terrorem and coercive effect of the DEP's directive." Ibid.
*185 The facts supporting CPS's claim for indemnification are, if anything, even more compelling here. Acting in its statutory capacity as trustee of public resources, see N.J.S.A. 58:10-23.11a, the DEP sought and obtained a judgment awarding it monetary amounts sufficient to permit it to implement a plan designed to restore the watershed and well field to their condition prior to the unlawful discharge and emission of toxic wastes. So posited, the sum to be paid by CPS is little different from damages measured in terms of medical and hospital bills designed to restore an accident victim to health, damages intended to monitor and cure the deleterious effects of a party's tortious conduct, see Ayers v. Jackson Tp., 106 N.J. 557, 603-605 (1987), or damages consisting of amounts necessary to restore property to its status quo ante.
To be sure, the judgment in the underlying action mandates that the sums awarded by the court are to be used for the purpose of implementing specific remedial measures designed to restore the Prickett's Brook watershed. However, that obligation runs only to the DEP and the City, which are specifically designated as the parties responsible for implementing the remedial measures approved by the court. Cf. Woodland Private Study Group, et al v. State of New Jersey, Dep't of Environmental Protec., 109 N.J. 62 (1987). In sharp contrast to the responsibilities imposed upon the DEP and the City by the judgment, CPS has not been directed to undertake any remedial action. The final order and judgment are conspicuously devoid of any requirement that CPS, either itself or in conjunction with others, develop or assist in the development of specifications for the cleanup measures to be taken, or supervise the installation or construction of abatement and response devices.
Instead, the only obligation imposed upon CPS is the duty to pay money. That responsibility is no different from the legal obligation that burdens any party who has been held liable to pay damages and recompense the injured party so that he will be restored to the condition he was in prior to the occurrence of *186 the tortfeasor's conduct. The simple and overriding fact is that CPS has not been enjoined to do anything and the carriers' contrary assertions, however phrased, find no support in the judgment entered by the court.

II.
We also reject the argument, advanced by both USF & G and Continental, that the obligation of CPS to pay the costs of remedial measures is an economic loss and not compensation for injury to or destruction of tangible property. We recognize that the insurance policies issued by the carriers do not purport to protect the insured from the perils of business life. In that context, our Supreme Court has observed that "[t]he consequence of not performing [a contract] well is part of every business venture" and that "the replacement or repair of faulty goods and works is a business expense, to be borne by the insured...." Weedo v. Stone-E-Brick, Inc., supra, 81 N.J. at 239.
This much conceded, there exists another form of business risk, that is, injury to people and damage to property, caused by an insured's faulty performance. As pointed out in Weedo, "[u]nlike business risks of the sort described above, where the tradesman commonly absorbs the cost attendant upon the repair of his faulty work, the accidental injury to property or persons substantially caused by his unworkmanlike performance" exposes the insured to an essentially different kind of risk. Id. at 239-240. In that context, the risk intended to be insured against is the possibility that the conduct or product of the insured will cause bodily injury or damage to the property of another. Henderson, "Insurance Protection for Products Liability and Completed Operations  What Every Lawyer Should Know," 50 Neb.L.Rev. 415, 441 (1971). This liability is what the coverage is designed to protect against, tort liability for physical damage to others. Ibid.
*187 As we have stressed, the standardized provisions in the policies issued by USF & G and Continental were designed to convey this fundamental concept. The indemnification obligation thus encompassed claims for damages against the insured, CPS, for injury caused to the property of others. The fortuity that the City and the DEP, under either the parens patriae doctrine or by virtue of their statutory responsibilities, are obliged to take specific action to use the money awarded to eradicate the environmental damage caused by CPS is, in our view, wholly irrelevant. The critical fact is that CPS has been compelled in a court action to pay money to others for harm caused by its tortious conduct. We are convinced that the claims successfully pursued by the City and the DEP fall within the purview of the obligation undertaken by USF & G and Continental in their respective insurance contracts.

III.
We do not hold, nor do we intend to suggest, that the obligation of the carriers is open-ended or all-inclusive. As we stressed in Broadwell, "[t]o the extent that all or a portion of the response expenses pertain solely to damage to the [insured's property] and not to prevent off-site contamination, ... such damage is not within the coverage provided." Id. at 528-529. We emphasize that the obligation undertaken by USF & G and Continental relates solely to the cost of preventive measures designed to abate the continued migration of hazardous wastes into the Prickett's Brook watershed and the Runyon well field. It does not encompass damage to the CPS site itself or the cost of alterations designed to improve CPS's property or operations.
We hasten to add one additional caveat. We are not concerned here with prospective monetary damages for some undefined and speculative future loss. Stated somewhat differently, the carriers' obligation, for example, does not extend to the costs of modifying manufacturing or chemical processing procedures *188 or mechanisms designed to prevent future discharges or emissions of hazardous wastes. Rather, we hold that the obligation of the insurers is limited to indemnifying CPS for the monetary amounts awarded to the DEP for the latter's use in attempting to eradicate the effects of the present or past pollution for which the insured has been adjudged liable. At the time of the judgment in the underlying litigation, the migration of contaminants was continuing and ongoing. As in Broadwell Realty v. Fidelity & Cas., supra, 218 N.J. Super. at 528, "[f]urther peril was both imminent and immediate." To that extent, the insurers' obligation is to pay the costs of abating the polluting effects of prior discharges.

IV.
In our opinion in Broadwell, we observed that the questions presented had received somewhat uneven treatment in other jurisdictions. Id. at 529. We again allude to the disarray in the decisional authority on this issue throughout the country. Compare Continental Ins. v. N.E. Pharm. & Chem. Co., 811 F.2d 1180, 1188-1189 (8 Cir.1987), reh'g en banc granted 815 F.2d 51 (8 Cir.1987); Port of Portland v. Water Quality Ins. Syndicate, 796 F.2d 1188, 1194 (9 Cir.1986); Gloucester Tp. v. Maryland Cas. Co., 668 F. Supp. 394, 399 (D.N.J. 1987); Fireman's Fund Ins. Companies v. Ex-Cell-O-Corp., 662 F. Supp. 71, 75 (E.D.Mich. 1987); United States v. Conservation Chemical Co., 653 F. Supp. 152, 193 (W.D.Mo. 1986); Bankers Trust Co. v. Hartford Acc. & Indem., 518 F. Supp. 371, 373-374 (S.D.N.Y. 1981), vacated 621 F. Supp. 685 (S.D.N.Y. 1981); Chemical Applications Co. v. Home Indemnity Co., 425 F. Supp. 777, 779 (D.Mass. 1977); United States Aviex Co. v. Travelers Ins. Co., 125 Mich. App. 579, 589-581, 336 N.W.2d 838, 843 (App.Ct. 1983); Waste Manag. of Carolinas v. Peerless Ins., 72 N.C. App. 80, 93, 323 S.E.2d 726, 735 (App.Ct. 1984), rev'd on other grounds 315 N.C. 688, 340 S.E.2d 374 (Sup.Ct. 1986); Kutsher's Country Club v. Lincoln Ins. Co., 119 Misc.2d 889, 892-893, 465 N.Y.S.2d 136, 139 (Sup.Ct. 1983) with Maryland Cas. *189 Co. v. Armco, Inc., 822 F.2d 1348, 1353-1354 (4 Cir.1987); Mraz v. Canadian Universal Ins. Co., Ltd., 804 F.2d 1325, 1329 (4 Cir.1986). To some extent, this continuing debate is grounded in the difficulty attendant to the attempt "to accommodate common-law tort doctrines to the peculiar characteristics of toxic-tort litigation." Ayers v. Jackson Tp., supra, 106 N.J. at 581. In a slightly different context, it has been said that this "accommodation has failed, that common-law doctrines are ill-suited to the resolution of such injury claims, and that some form of statutorily-authorized compensation procedure is required if the injuries sustained by victims of chemical contamination are to be fairly redressed." Ibid. We are concerned here with the insurance ramifications of awards and remedies authorized by statute to combat environmental disaster.
Against that backdrop, we again refer, as we did in Broadwell, to the interpretational aids long applied by our courts in our attempt to fairly construe insurance contracts. Broadwell Realty v. Fidelity & Cas., supra, 218 N.J. Super. at 523-525. Such contracts "are prepared by the company's experts, [people] learned in the law of insurance," Mazzilli v. Acc. & Cas. Ins. Co. of Winterthur, 35 N.J. 1, 7 (1961), and therefore it is not unfair that the insurer "bear the burden of any resulting confusion." Gaunt v. John Hancock Mut. Life Ins. Co., 160 F.2d 599, 602 (2 Cir.1947), cert. den. 331 U.S. 849, 67 S.Ct. 1736, 91 L.Ed. 1858 (1947). Our courts have thus "adopted the principle giving effect to the `objectively reasonable expectations' of the insured for the purpose of rendering a `fair interpretation' of the boundaries of insurance coverage." Meier v. New Jersey Life Ins. Co., 101 N.J. 597, 612 (1986), quoting Di Orio v. New Jersey Manufacturers Insurance Company, 79 N.J. 257, 269 (1979). See also Allen v. Metropolitan Life Ins. Co., 44 N.J. 294, 305 (1965); Kievit v. Loyal Protect. Life Ins. Co., 34 N.J. 475, 482 (1961).
These principles are no less applicable merely because the insured is itself a corporate giant. The critical fact remains that the ambiguity was caused by language selected by the *190 insurer. Contrary to the argument advanced by USF & G and Continental, the standard-form policy language does not limit coverage for property damage to claims asserted by fee simple owners of damaged property. Neither does the language limit coverage, as both carriers contend, to strictly common-law tort liability for property damage. If the insurers had desired to so radically constrict the coverage provided by their standard-form policies, they could easily have accomplished their intent by employing clear and unequivocal language. Instead, they broadly promised to indemnify CPS for all sums that it was held legally obligated to pay because of property damage. We necessarily consider the fact that alternative or more precise wording, if used, "would have put the matter beyond reasonable question."[4]Mazzilli v. Acc. & Cas. Ins. Co. of Winterthur, supra, 35 N.J. at 7. The ambiguity thus created must be resolved against the insurers.

V.
In granting partial summary judgment, the trial judge did not have the benefit of our opinion in Broadwell Realty v. Fidelity & Cas., supra. No attempt was made to determine what pecuniary amounts were awarded to the City and the DEP in order to abate the continuing migration of organic chemicals into Prickett's Brook watershed and the Runyon well field. The matter was not briefed, argued or determined at the trial level and remains unresolved. The question is clearly factual. We thus find that the summary judgment remedy was inappropriate. The matter must be remanded for a plenary hearing respecting this issue.
*191 Accordingly, the partial summary judgment in favor of USF & G and Continental is reversed and the matter is remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.
NOTES
[1] For convenience, our reference to CPS includes CPS Chemical Company, Chemical & Pollution Sciences, Inc., CPS Research Corporation and Edward Treuger & Company.
[2] All defendants except CPS and Madison Industries, Inc. were subsequently dismissed from the action.
[3] The trial court reserved any ruling on the insurers' obligation to indemnify CPS for the $100,000 in compensatory damages awarded to the City for the temporary loss of the Runyon well field acreage. However, the court held that there was no coverage for the additional $5.1 million in cleanup costs awarded to the DEP and the City.
[4] We note that the new standard-form language, which is marketed worldwide by USF & G and Continental, expressly excludes coverage for "[a]ny loss, cost or expense arising out of any governmental direction or request that [the insured] test for, monitor, clean up, remove, contain, treat, detoxify or neutralize pollutants." 1984 Insurance Services Official Commercial Gen. Liab. Coverage Form, at 2 (Ex. 13).