229 N.J. Super. 56 (1988)
550 A.2d 1235
SUMMIT ASSOCIATES, INC., PLAINTIFF-RESPONDENT,
v.
LIBERTY MUTUAL FIRE INSURANCE COMPANY, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Submitted April 20, 1988.
Decided July 29, 1988.
*58 Before Judges FURMAN, LONG and SCALERA.
Schwartz & Andolino, attorney for appellant (Martha J. Koster, of the Massachusetts bar, admitted pro hac vice for Gaston Snow & Ely Bartlett, attorneys).
Kimmelman, Wolff & Samson, attorneys for respondent (Dennis M. Toft and Judith I. Goldberg, on the brief).
Smith, Stratton, Wise, Heher & Brennan, filed a brief amicus curiae for Insurance Environmental Litigation Association (William J. Brennan, III, on the brief; Piper & Marbury, of counsel; Thomas W. Brunner, Laura A. Foggan and Marilyn E. Kerst, on the brief).
Ronca, McDonald & Hanley filed a brief amicus curiae for Claude James Ayliffe, and Underwriter at Lloyd's, London (William J. Hanley, Robert J. Kovacs; Mendes & Mount, of counsel; John G. McAndrews and Henry Lee, on the brief).
Lowenstein, Sandler, Kohl, Fisher & Boylan filed a brief amicus curiae for AT & T Technologies, Inc., Armstrong World Industries, Inc., Chemical Manufacturers Ass'n, E.I. Dupont DeNemours & Company, International Business Machines Corporation, Olin Corporation and Richardson-Vicks, Inc; Kirkpatrick & Lockhart, attorneys for Westinghouse Electric Corp. (Covington & Burling, of counsel; Richard D. Wilkinson, on the brief).
*59 The opinion of the court was delivered by LONG, J.A.D.
This appeal involves the interpretation of language contained in a comprehensive liability insurance policy issued by defendant Liberty Mutual Fire Insurance Company (Liberty) insuring the property of plaintiff Summit Associates, Inc. (Summit). The case began when Summit filed a complaint against Liberty seeking reimbursement for the sums it was required to pay to clean up and remove certain hazardous substances discovered on its property. Liberty answered denying coverage based on several policy exclusions. After a bench trial, the trial judge ruled in Summit's favor and entered judgment for Summit in the amount of $438,599.76, plus prejudgment interest and counsel fees. Liberty appeals.
The following facts were established at trial: Summit, a real estate developer, purchased property in the Raritan Center from Edison Township in 1978. Twenty years earlier, Edison had used the property as a sewage treatment facility. When it purchased the property, Summit was not informed that any portion of the sewage treatment facility remained buried at the site, nor was it advised of any sludge or hazardous substance buried there. According to Edison, it had no knowledge of hazardous or toxic substance buried at the site either. The property, which was part of the Raritan Arsenal, had been acquired by Edison from the United States Government in 1965. Maps of the arsenal depicted areas designated as "contaminated," as a result of being used to burn munitions. Summit had previously developed land surrounding the site, as well as part of this tract, without encountering underground sewage structures. It planned to develop this tract as a parking lot for an adjacent office building/hotel complex. Before Summit's workmen began excavation for the parking lot, the land was covered by trees, brush, sand and one concrete structure, about three to four feet high and about 20 to 40 feet in length. It was surrounded by a lagoon, or spillway, for water runoff from the sewage treatment plant. Summit's plan was to level out the dirt, knock down the concrete structure, push it in and bury *60 it. In the course of accomplishing this, in mid-July 1983, underground pipes leading from what turned out to be a large underground sludge pit to the lagoons were disturbed and began leaking odiferous liquid.
John O. Grun, Edison Township Assistant Health Officer, was called to the site on July 15, 1983 by the Middlesex County Health Department's air pollution program. (Eventually the County Health Department, the State Department of Environmental Protection (DEP) and the Federal Environmental Protection Agency (EPA) delegated to Grun the responsibility of cleaning-up Summit's site.) Grun said the odor had a heavy, nauseating, chemical smell. He ordered Summit to stop the job and test the material. About a week later, in response to complaints of a horrible odor, he returned. He observed a storage tank from which the same odor emanated. It was about 25 feet across and filled with sludge. Grun told Summit to remove the sludge as soon as possible because it constituted a "public health nuisance." Grun stated that he defined that term based "on my own nose, if you will." A representative of Environmental Services, Inc. (ENSI), the company which ultimately removed the waste, testified that Edison ordered expeditious cleanup because of the toxic materials as well as the smell.
Analysis by Environmental Testing and Certification, Inc. (ETC) revealed that the liquid and sludge contained several substances defined as hazardous by the EPA. ETC's representative, Dr. Lin, said he drove by the site daily, trying not to breathe because "when it first hits you, you say, `I shouldn't take in any of this,' and you try to stop breathing and drive by." Summit was ordered to remove this toxic material pursuant to the Spill Compensation and Control Act. N.J.S.A. 58:10-23.11 et seq.
On July 25, 1983, the area where the concrete structure had been pushed in and covered over with dirt began to cave in. Workers found a tank about 10 feet wide and 10 feet deep, *61 cleaned it out and filled it with stone. This small tank was actually a part of the big sludge pit ultimately discovered. On August 1, 1983, a second sink hole appeared in the same spot. Workers discovered that under a concrete floor, 10 feet below surface, sludge was contained in an area to a depth of approximately 24 feet. Some of the workmen became sick at this point. The smell was almost unbearable. Workers mixed the jello-like sludge with dirt in a ratio of one to three and spread it out to dry. (Health regulations require that the liquid and solid waste be removed separately). ENSI eventually removed about 2000 tons of sludge and 50,000 gallons of liquid waste. The cost was $438,599.76.
The Liberty policy under which Summit was insured provides that:

SECTION II. LIABILITY COVERAGE  SINGLE LIMIT FORM. SPECIAL MULTI-PERIL POLICY COMPREHENSIVE GENERAL LIABILITY INSURANCE.
1. Bodily Injury Liability

Property Damage Liability.
The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of
bodily injury or property damage
to which this insurance applies caused by an occurrence.
No claim of bodily injury has been advanced in this case. Property damage is defined in the policy as follows:
(1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period.
Occurrence is defined as:
accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured.
The policy contains an exclusion for damage to the insured's own property:
Exclusions
This insurance does not apply
* * * * * * * *

*62 (k) to property damage to
(1) property owned or occupied by or rented to the insured.
(2) property used by the insured, or
(3) property in the care, custody or control of the insured or as to which the insured is for any purpose exercising physical control:
The policy also contains what is commonly known as a pollution exclusion which covers:
bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water, but this exclusion does not apply if such discharge dispersal release or escape is sudden and accidental. (emphasis added).
Relying on these provisions, Liberty disclaimed liability for the expenses incurred by Summit in cleaning up the sludge. The gist of Liberty's position was and is that Summit's cleanup is subject to the "owned property" exclusion in the policy, that the sludge accumulation is not an "occurrence" subject to coverage and that coverage is precluded by the "pollution" exclusion in the policy.
Applying traditional standards of interpretation, the trial judge ruled that the uncovering of the sludge pit was an occurrence within the meaning of the policy and that the pollution exclusion is not applicable. We affirm those determinations as based upon findings which are adequately supported by the evidence (R.2:11-3(e)(1)(A) and in conformity with our prior rulings. See Broadwell Realty v. Fidelity & Cas. Co. of N.Y., 218 N.J. Super. 516 (App.Div. 1987); Lansco, Inc. v. Dept. of Environmental Protection, 138 N.J. Super. 275, 282 (Ch.Div. 1975), aff'd 145 N.J. Super. 433 (App.Div. 1976), certif. den. 73 N.J. 57 (1977); CPS Chem. Co. Inc. v. Continental Ins. Co. 199 N.J. Super. 558, 569 (Law Div. 1984), rev'd on other grounds 203 N.J. Super. 15 (App.Div. 1985); Jackson Tp. Etc. v. Hartford Acc. & Indemn. Co., 186 N.J. Super. 156, 161 (Law Div. 1982). The occurrence clause is meant to prohibit coverage only where it is shown that the insured knew or should have known of the ongoing pollution. In order to succeed with its claim that this *63 was not an occurrence, Liberty needed to establish that Summit knew or should have known of the likelihood that construction on its premises would result in the release of contaminants. On this record, Liberty failed to sustain that burden. As for Liberty's claimed insulation from liability by way of the pollution exclusion, our courts have consistently interpreted that exclusion to constitute the equivalent of an occurrence and to eliminate coverage only where such damages appear to be expected or intended on the part of the insured. Jackson Township v. Hartford Acc. & Indem. Co., supra, 186 N.J. Super. at 161-164, Broadwell, supra, 218 N.J. Super. at 533. As the trial judge properly noted, this record does not support such findings.
The trial judge also determined that the owned property exclusion does not preclude coverage because the health, safety and welfare of the people of New Jersey outweigh the express provisions of the insurance policy. He said:
it does not exclude coverage here, where Summit undertook the expedient and proper removal of hazardous waste from its property in compliance with the requirements of N.J.S.A. 58:10-23.11 et seq. The underlying Public policy in this area is quite clear when the potential for damage to the environment is this great. Consequently, the health, safety and welfare of the people of this State must outweigh the express provisions of the insurance policy in issue. As a result, the exclusion clause in the policy which pertains to excluding coverage where the damage is to the policyholder's land, must be held inapplicable where the danger to the environment is extreme.
According to the judge, public policy, which recognizes the immediacy of the toxic waste cleanup problem must control over what he viewed as the plain meaning of the contract language in a situation such as this, where a private landowner is required to pay the cost of cleanup to prevent damage to the environment pursuant to the Spill Compensation and Control Act, N.J.S.A. 58:10-23.11f(a).
We disagree. While public policy as expressed in our statutes may have set the stage for Summit's claim, it cannot alter clear provisions of a contract between the parties. Since the time of the trial judge's decision in this case, we decided *64 Broadwell Realty v. Fidelity & Cas., supra, in which we interpreted insurance contract language nearly identical to this in a relevant context. In Broadwell, we held that an owned property exclusion did not preclude an insured from recovering under a comprehensive general liability policy for costs incurred in cleaning up its own property pursuant to a DEP directive where such costs were necessary to prevent damage to the property of third parties. It seems to us, and both parties agree, that Broadwell is the touchstone of this inquiry. Liberty claims that Broadwell excludes coverage in this case because no threat to the property of third parties was established. Summit claims that Broadwell precludes application of the owned property exclusion because its cleanup was to prevent damage to the environment. For our purposes, the crucial aspect of Broadwell is its reaffirmation of the applicability of traditional principles of insurance contract interpretation to this situation:
[w]hatever the relative merits of the competing public policies identified and advanced by the parties, we perceive no legal principle which would permit us to circumvent what the contracts says. [218 N.J. Super. at 523.]
Because the trial judge failed to apply those principles in determining the applicability of the owned property exclusion, we reverse and remand the matter to him for reconsideration of this issue.
The trial judge's first obligation on remand will be to determine whether the opening of the sludge pit damaged or threatened damage to third party property. If he decides that no such damage occurred or was threatened, that will be the end of the inquiry because, as a matter of fact, the owned property exclusion will be applicable. If, on the other hand, he decides that the opening of the sludge pit threatened damage to third party property, he must then apply the traditional principles of insurance contract interpretation we reaffirmed in Broadwell including whether application or non-application of the owned property exclusion would best carry out the reasonable expectations of the parties. 218 N.J. Super. at 524-525.
*65 If the trial judge finds that the owned property exclusion does not bar recovery, this will not end the inquiry. The policy provides coverage for sums "which the insured shall become legally obligated to pay...." At the time of the discharge in 1983, the Spill Act, upon which the order for cleanup was based and which undergrids Summit's claim of a "legal obligation" for damages against Liberty, defined an actionable discharge as:
any intentional or unintentional action or omission resulting in the releasing, spilling, leaking, pumping, pouring, emitting, emptying or dumping of hazardous substance into the waters of the State or onto lands from which it might flow or drain into said waters, or into waters outside the jurisdiction of the State when damage may result to the lands, waters or natural resources within the jurisdiction of the State; (emphasis added). [N.J.S.A. 58:10-23.11b(h)].
In 1984, the requirement that a discharge must threaten the waters of the state was deleted from the Act. L. 1984, c. 142, § 1. Now, a discharge directly onto land without threatening the waters of the state is actionable if it threatens our natural resources. This was not the case in 1983, when a threat to the state's waters was a requirement of the Act. Here, although it seems likely that the state's waters were threatened, there were no findings as to whether the 2,000 tons of toxic sludge and 50,000 gallons of liquid waste on Summit's property actually posed a threat to the waters of the state, as there was in Broadwell where we emphasized:
the unrefuted evidence contained in the record that contaminants were discharging into a nearby stream .. . Under the parens patriae doctrine the state had a colorable claim for damage to the stream. [218 N.J. Super. at 528].
Without a showing of a threat to the state's waters, a discharge onto land would not have justified action by the state under the 1983 version of the Spill Act. Concomitantly, no legal obligation under the Spill Act for cleanup costs triggering Liberty's policy would have existed. Although Summit never defended against the cleanup order on these grounds, we think Liberty is entitled to explore them on the remand. The record may be supplemented, if necessary, and the judge will be required to make findings as to the statutory mandate. If it is established that the discharge on Summit's property threatened the state's *66 waters, the judge may proceed to determine the question of whether the threatened damage to third party property was immediate and imminent or whether it was an "undefined and speculative future loss" which should be excluded from coverage. Broadwell, supra and CPS Chemical Company v. Continental Ins. Co., 222 N.J. Super. 175, 187 (App.Div. 1988). If the state's waters were not threatened and the 1983 version of the Spill Act is not implicated, we do not preclude Summit from advancing alternative authority to support a legal obligation on its part for cleanup, if such is available.
REVERSED AND REMANDED.