231 N.J. Super. 1 (1989)
554 A.2d 1342
DIAMOND SHAMROCK CHEMICALS COMPANY, PLAINTIFF-RESPONDENT,
v.
THE AETNA CASUALTY AND SURETY COMPANY, ET AL., DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued December 13, 1988.
Decided January 30, 1989.
*2 Before Judges ANTELL, DREIER and BROCHIN.
Stephen D. Cuyler argued the cause for appellants, General Reinsurance Company, et al., in Appeal A-4042-87T1F (Cuyler & Burk, attorneys, and Sheft, Wright & Sweeney, attorneys; Peter Petrou and Stephen D. Cuyler, on the brief).
Allan B. Taylor, of the New York Bar, admitted pro hac vice, argued the cause for appellants The Aetna Casualty and Surety Company, et al., in Appeal A-4043-87T1F (Day, Berry *3 & Howard, attorneys, and Connell, Foley & Geiser, attorneys; Mr. Allen B. Taylor and John B. LaVecchia, on the brief).
Appellants, The AIG Companies, relied on the brief filed on behalf of The Aetna Casualty and Surety Company (Day, Berry & Howard and Connell, Foley & Geiser).
Appellant, Commercial Union Insurance Company, relied on the brief filed on behalf of The Aetna Casualty and Surety Company (Day, Berry & Howard and Connell, Foley & Geiser).
Appellant, Fireman's Fund Insurance Company, relied on the brief filed on behalf of The Aetna Casualty and Surety Company (Day, Berry & Howard and Connell, Foley & Geiser).
Appellant, The Home Insurance Company, relied on brief filed on behalf of The Aetna Casualty and Surety Company (Day, Berry & Howard and Connell, Foley & Geiser).
Appellants, Insurance Company of North America and California Union Insurance Company, relied on the brief filed on behalf of The Aetna Casualty and Surety Company (Day, Berry & Howard and Connell, Foley & Geiser).
Appellants, United States Fire Insurance Company and London Guarantee and Accident Company of New York, relied on the brief filed on behalf of The Aetna Casualty and Surety Company (Day, Berry & Howard and Connell, Foley & Geiser).
Raymond L. Falls, Jr., of the New York Bar, admitted pro hac vice, argued the cause for respondent in both Appeals (Cahill, Gordon & Reindel, attorneys, and Pitney, Hardin, Kipp & Szuch, attorneys; James C. Pitney and Dennis R. LaFiura, on the brief).
William J. Brennan, III, argued the cause for amicus curiae, Insurance Environmental Litigation Association in Appeal A-4043-87T1F (Smith, Stratton, Wise, Heher & Brennan, *4 attorneys, and Wiley, Rein & Fielding, attorneys; William J. Brennan and Wendy L. Mager, on the brief).
The opinion of the court was delivered by BROCHIN, J.S.C. (temporarily assigned).
Plaintiff Diamond Shamrock Chemicals Company is a large corporation engaged in the business of manufacturing chemical products for home and industrial use. The defendants are Aetna Casualty and Surety Company and other primary and excess insurers which insured Diamond under comprehensive general liability policies issued between 1951 and 1984. Diamond's complaint seeks a declaration that by virtue of these policies, it is entitled to indemnification from its insurers for the costs of remedying the consequences of dioxin contamination which has resulted from its manufacturing operations on its property at 80 Lister Avenue, Newark, New Jersey.
The defendants' answers deny liability and assert affirmative defenses based on the language of the relevant policies, including exclusion clauses, which define their coverage. In order to test these affirmative defenses, the parties made various motions for partial summary judgment. Leave was sought to appeal to this court from several of the trial court's orders on these motions, but leave was granted for an appeal only from an order which ruled that the clauses of the policies which exclude claims for damages to the insured's own property are "inapplicable" to bar the indemnification which Diamond seeks.
The basic insuring agreement contained in Diamond's comprehensive general liability policies reads as follows:
The company will pay on behalf of the insured all sums which the insured shall become liable to pay as damages because of bodily injury or property damage to which this insurance applies, caused by an occurrence....
The relevant exclusion clauses state:
This policy does not apply:
(i) to property damage to
(1) property owned or occupied by or rented to the insured,
(2) property used by the insured, or

*5 (3) property in the care, custody or control of the insured or as to which the insured is for any purpose exercising physical control;
(j) to property damage to premises alienated by the named insured arising out of such premises or any part thereof.
(In this opinion we refer to clause "i" as the "owned property" exclusion and clause "j" as the "alienated property" exclusion.)
The court's ruling that these provisions are "inapplicable" was incorporated in an order entered February 4, 1988, which reads as follows:
ORDERED that the motions of defendants Aetna Casualty and Surety Company ... joined by the defendants listed ... for summary judgment to exclude coverage for property damage to the insured's property, and/or to exclude coverage for property damage to property in the care, custody or control of the insured, and/or to exclude coverage for property damage to premises alienated by the insured are denied, and that Diamond's cross-motion to declare the aforesaid exclusions inapplicable is granted, all as more particularly set forth in the Court's oral statement... on December 11, 1987 ... [Emphasis added.]
The only issues now before us are those raised by defendants' appeal from the underlined portion of this order. We reverse and remand, holding only that the exclusions are potentially applicable and that a final decision as to their applicability should be made on the basis of a fully developed record.
Diamond acquired the manufacturing facility at 80 Lister Avenue, Newark, in 1951 and sold it in 1971. It reacquired the site and adjacent property in 1984 and 1986 to facilitate the clean up or containment of the dioxin contamination which was ordered by the DEP.
From 1951 until early 1969, Diamond manufactured a chemical at its 80 Lister Avenue facility which it used in the production of various herbicides. Dioxin, a chemical which has proven highly toxic to laboratory animals, was a by-product of that manufacturing process.
On June 2, 1983, Govern Thomas Kean issued an Executive Order which recited that 80 Lister Avenue "may be contaminated with potentially high levels of ... dioxin," that dioxin is "a substance known to be highly toxic to humans" and that a "potential hazard exists to the public health because of the *6 possibility of transportation of contaminated substances off the above described premises into immediately surrounding areas." The Order invoked the Governor's emergency powers and directed the Commissioner of the Department of Environmental Protection to take the necessary steps to abate those conditions. Pursuant to that Executive Order, the DEP issued an administrative order on June 13, 1983, which directed Diamond to:
install a suitable ground cover over all exposed portions of this Lister Avenue site, utilizing a contractor approved by this Department and EPA, such that wind blown spread of dust from said premises is minimized to the maximum extent practicable [and to t]ake other measures during and subsequent to the installation of the aforesaid groundcover as directed by the DEP's on scene coordinator to prevent further off-site migration of dioxin.
Diamond was also ordered to construct a fence around the perimeter of the property in order to bar access to the site.
On March 13, 1984, an Administrative Consent Order was executed which required Diamond to obtain a site evaluation plan and a feasibility study at its own expense which would evaluate all remedial action potentially appropriate for the site, and to submit them to the DEP. Diamond states that it has completed the process of gathering data for the study and has submitted it to the DEP. The study recommends the demolition of all buildings on the property, the construction of a slurry wall around its perimeter, the compaction of all contaminated material into a mound which would then be covered by a layered cap, and the installation of a ground water recovery and treatment system.
According to Diamond, the only remedial measures thus far implemented are the installation of a tarpaulin-like ground cover and the construction of the peripheral fence. Implementation of additional remedial measures is awaiting the DEP's approval of the remedial plan. The estimated cost for implementing the plan advocated by Diamond is approximately $8,000,000, plus annual operating and maintenance expenses of $261,000. The estimated cost of the most expensive remediation plan considered by the study, an off-site thermal treatment option, is said to be $248,000,000 plus $62,000 annually for *7 operating and maintenance expenses. Although the costs incurred thus far, for the study and for the tarpaulin and fence, are no doubt more than negligible, presumably they are small in comparison with the potential aggregate costs.
For purposes of the motion for summary judgment which resulted in the February 4, 1988, order from which this appeal has been taken, the foregoing facts are not disputed. However, Diamond denies that "all of the costs at issue in the motion for summary judgment arise from cleanup measures taken within the boundary of the Lister Avenue plant property." It asserts that:
The motions and cross-motion for summary judgment addressed not the recoverability of particular costs but the sufficiency as defenses of particular exclusions. What may ultimately be involved in the remediation on or off the Newark site for which Diamond is responsible is not presently knowable, and it is for that reason that Diamond seeks a decree declaring and enforcing the obligations of the defendants.
In support of Diamond's assertions that off-site remediation measures may ultimately be required, it relies upon language in Governor Kean's June 2, 1983, Executive Order which declared that the New Jersey Department of Environmental Protection had reached the "preliminary conclusion" that the 80 Lister Avenue site "may be contaminated with potentially high levels of ... dioxin ... and, accordingly, ... that a potential hazard exists to the public health because of the possibility of transportation of contaminated substances ... into immediately surrounding areas", and upon language in the DEP's orders expressing concern that the dioxin contaminating the site will adversely affect the public health and the environment, presumably by migrating off the site. Diamond does not refer to any findings contained in its newly completed comprehensive investigation of the site to show that dioxin has moved off of its property or presents an imminent threat of doing so. In any event, whether the remediation efforts are expended on or off of Diamond's property was, in the view of the trial court and, for somewhat different reasons, in our view also, immaterial to Diamond's right to indemnification.
*8 As previously noted, the issue which is now before us on appeal is the trial court's ruling that, as a matter of law, Diamond's claims are not barred by the policy exclusions for "property damage to ... property owned or occupied by ... or ... in the care, custody or control of ... or ... alienated by the named insured arising out of such premises or any part thereof." After that ruling had been issued, this court rendered its decision in CPS Chemical Co. v. Continental Insurance Co., 222 N.J. Super. 175 (App.Div. 1988). On the basis of that decision, the insurers moved for reconsideration of the trial court's ruling that the "owned property" and "alienated premises" exclusions were "inapplicable" to the present case. They pointed out that in CPS we said:
As we stressed in Broadwell, "[t]o the extent that all or a portion of the response expenses pertain solely to damage to the [insured's property] and not to prevent off-site contamination, ... such damage is not within the coverage provided." [quoting Broadwell Realty v. Fidelity & Cas., 218 N.J. Super. 516, 528-529 (App.Div. 1987)] We emphasize that the obligation undertaken by [CPS's insurers] relates solely to the cost of preventive measures designed to abate the continued migration of hazardous wastes into the Prickett's Brook watershed and the Runyon well field. It does not encompass damage to the CPS site itself or the cost of alterations designed to improve CPS's property or operations. [Id. at 187]
On the basis of our CPS decision, the insurers argued that the summary judgment holding the "owned property" and "alienated premises" exclusions inapplicable should not have been granted, and that the liability of the insurers should have awaited proof at trial showing what part of Diamond's expenditures pertained solely to damage to its own property and what to the cost of preventive measures to prevent off-site contamination.
The trial judge granted the motion for reconsideration, but adhered to his ruling. He distinguished CPS and Broadwell on the ground that in those cases the property owners were continuing to utilize the property for productive purposes while in the present case Diamond had reacquired the property solely to facilitate the cleanup, and he held that whether all or any part of Diamond's expenditures were being used to clean up its *9 own property or the property of others was immaterial because the remediation measures were not being undertaken for the benefit of Diamond, but solely to comply with the demands of the government.
In their appeal to this court, the insurers (and the amicus curiae) argue, first, that the fact that Diamond was compelled by DEP to spend money for the cleanup of its property did not make the "owned property" and "alienated premises" exclusions inapplicable. Secondly, they contend that Broadwell and CPS were wrongly decided, but that since the trial court was obligated to follow them, it should have held a trial to distinguish expenses of cleaning up Diamond's own property from those incurred to prevent the imminent spread of pollution; only the latter costs, they argue, are compensable, even under Broadwell and CPS. Thirdly, one group of insurers argues that the trial court committed error in construing the language of the policies strongly against the insurers (contra proferentem) on a motion for summary judgment; rather, these insurers contend, the court should afford them the opportunity to prove at trial that Diamond itself has interpreted the policies in a way which would bar its present claims.
We turn to our decisions in Broadwell Realty Services, Inc. v. Fidelity & Casualty Co., 218 N.J. Super. 516 (App.Div. 1987), and CPS Chemical Co. v. Continental Insurance Co., 222 N.J. Super. 175 (App.Div. 1988).
Strictly speaking, CPS, as presented to the court, did not involve the "owned property" and "alienated premises" exclusions whose interpretation is the sole issue before us. Our opinion in that case states, "Both carriers [for the polluter] denied liability on the basis that the sum of money for which CPS was adjudged liable did not constitute pecuniary damages and thus did not fall within the policy coverage." The relevant provisions of the policy which were quoted verbatim did not include the exclusion provisions at issue here. CPS Chemical *10 v. Continental Insurance Co., 222 N.J. Super. at 181. Nonetheless, our opinion stated:
We emphasize that the obligation undertaken by [the insurers] relates solely to the cost of preventive measures designed to abate the continued migration of hazardous wastes into the Prickett's Brook watershed and the Runyon well field. It does not encompass damage to the CPS site itself or the cost of alterations designed to improve CPS's property or operations....
... we hold that the obligation of the insurers is limited to indemnifying CPS for the monetary amounts awarded to the DEP for the latter's use in attempting to eradicate the effects of the present or past pollution for which the insured has been adjudged liable. At the time of the judgment in the underlying litigation, the migration of contaminants was continuing and ongoing. As in Broadwell Realty v. Fidelity & Cas., supra, 218 N.J. Super. at 528, "[f]urther peril was both imminent and immediate." To that extent, the insurers' obligation is to pay the cost of abating the polluting effects of prior discharges. [Id. at 187-188]
Broadwell squarely holds that an insurer under a general public liability policy like those at issue in the present case which contain the "owned property" and "alienated premises" exclusions, is not liable for "elements of the claim which relate to remedies for damage confined to" the insured's property and that "[t]o the extent that all or a portion of the response expenses pertain solely to damage to the [insured's] site itself and not to prevent off-site contamination, the owned-property exclusion clearly applies, and such damage is not within the coverage provided." Broadwell Realty v. Fidelity & Cas., 218 N.J. Super. 516, 528 (App.Div. 1987).
More recently, in Summit Associates, Inc. v. Liberty Mutual Fire Insurance Company, 229 N.J. Super. 56 (App.Div. 1988), a suit in which an insured under a general public liability policy sought indemnification from its insurer for the money which the government required it to spend to remove hazardous pollutants which it discovered when it excavated its newly purchased property, we remanded the case to the trial court to determine whether the pollution "damaged or threatened damage to third party property." Id. at 65. The trial judge was instructed as follows:
If he decides that no such damage occurred or was threatened, that will be the end of the inquiry because, as a matter of fact, the owned property exclusion *11 will be applicable. If, on the other hand, he decides that the opening of the sludge pit threatened damage to third party property, he must then apply the traditional principles of insurance contract interpretation we reaffirmed in Broadwell including whether application or non-application of the owned property exclusion would best carry out the reasonable expectations of the parties. [Ibid.]
In CPS and Broadwell, pollutants had escaped from the property of the insured and had already caused injury to the property of third parties. In CPS, those pollutants had infiltrated Perth Amboy's well field, contaminating its water supply. Perth Amboy asserted a conventional damage claim for injury to its property. The Department of Environmental Protection, which was a co-plaintiff, sought and obtained a judgment compelling the defendants to pay money which would be used to remedy injuries to property of parties other than the insured and to protect their property from further injury. We stated, "The critical fact is that CPS has been compelled in a court action to pay money to others for harm caused by its tortious conduct." CPS, 222 N.J. Super. at 187.
In Broadwell, we said:
We again emphasize the unrefuted evidence contained in the record that contaminants were discharging into a nearby stream and into two New Jersey Bell cable vaults and that this destructive process was ongoing. Under the parens patriae doctrine, the State had a colorable claim for damage to the stream. New Jersey Bell also had a right to be compensated for whatever damage was caused by release of the gasoline from the underground storage tanks situated on Broadwell's property. [Id. 218 N.J. Super. at 528]
Insofar as the "owned property" and "alienated premises" exclusions are concerned, the claims asserted against the insureds in both CPS and Broadwell fell squarely within the coverage of the policies. Each insured had become liable to pay money as damages because of property damage to property which it did not own and had never alienated. In CPS the damaged property was Perth Amboy's well fields; in Broadwell, New Jersey Bell's cable vaults and a stream in which the public, represented by the State, had an interest.
In both Broadwell and CPS this court held that the insured was entitled to be indemnified for, among other things, sums *12 expended on measures to prevent further, imminently impending, injury to property owned by someone other than the insured. There is no novelty to the proposition that in a conventional tort action, once some present injury has been proved, the plaintiff's damages may include the cost of measures intended to prevent future injury. See Associates Metals Corp. v. Dixon Chemical, 82 N.J. Super. 281, 315 (App.Div. 1964), certif. den. 42 N.J. 501 (Metal dealer's damages for injury to steel inventory from acid dust included the cost of tarpaulin, oil, equipment and labor to protect the steel against further damage.); Barbari v. Bochinsky, 43 N.J. Super. 186 (App.Div. 1956) (Damages for continuing trespass by an encroaching wall include costs of removing the wall to abate future trespass.); Annotation, "Expense incurred by injured party in remedying temporary nuisance or in preventing injury as element of damages recoverable", 41 A.L.R.2d 1064 (1955). Cf. Ayers v. Jackson Township, 106 N.J. 557 (1987) (Damages for toxic tort include costs of future medical surveillance.). Furthermore, the critical question in Broadwell and CPS was not whether the measures for which reimbursement was sought had been taken on the insured's own property or on property of a third party. The "owned property" exclusion does not purport to exclude claims because they are for sums expended for work performed within the premises owned by the insured. It excludes claims for sums which the insured is obligated to pay for "property damage to ... property owned ... by ... the insured." Claims arising out of injury to property of others for which the insured is responsible are covered by the terms of the policies even if the insured's damages are measured in part by the cost of remedial work which has to be performed on the insured's own property. The critical question, therefore, was, as we described it in Broadwell, whether expenditures were "attributable to correcting damage to Broadwell's property, which are not recoverable", or whether they were "attributable to abatement of damage to adjacent lands, which are." Broadwell, supra, 218 N.J. Super. at 529. Both CPS and Broadwell were remanded *13 for trial to determine the amount of expenditures in the recoverable category.
We agree that those cases are factually distinguishable from the present case on the ground stated by the trial court, that the property owners in CPS and Broadwell, unlike Diamond, were continuing to utilize their properties and would benefit directly from some part of the expenditures for which they were seeking indemnification. In our opinion, however, the fact that Diamond's expenditures for remediation have been and will be made only because of governmental compulsion does not establish that the "owned property" and "alienated premises" exclusions are "inapplicable" to a determination of the scope of the insurers' obligations. Suppose for example that a building has been destroyed by fire. Suppose that the building was located in a municipality whose ordinance required that it be rebuilt or totally razed within a stated period of time.[1] Despite governmental compulsion on the owner to comply with such an ordinance, he could not reasonably expect his comprehensive general liability insurer to indemnify him for the costs of rebuilding or demolition. Rather, CPS and Broadwell establish that under the language of a public liability policy like those upon which Diamond's rights rest, it is a claim against the insured for damage to property of someone other than the insured which triggers the insurers' obligation to indemnify, not merely a coercive claim by the government. In the present case, there has been no showing, certainly no showing beyond genuine dispute, that anyone else besides Diamond has yet been *14 injured in his person or property by the dioxin on Diamond's site.
Summit Associates, Inc., v. Liberty Mutual Fire Insurance Company, supra, raises the possibility of going one step further than CPS or Broadwell. In Summit, unlike either of the other two cases, when the insured spent money to clean up its own property in compliance with the orders of a governmental agency, the pollution on its property had not injured anyone else's person or property. Summit holds that if the pollution neither damaged nor threatened to damage the property of someone other than the insured, the insurer is not responsible for the clean up costs. However, our opinion goes on to tell the trial judge that if the pollution on Summit's property did threaten injury to the property of a third party, "he must then apply the traditional principles of contract interpretation we reaffirmed in Broadwell including whether application or non-application of the owned property exclusion would best carry out the reasonable expectations of the parties." Summit Associates, Inc., supra, 229 N.J. Super. at 65. Presumably even if there was threatened injury to the property of a third party, the insurer would be liable in Summit only if, applying those principles, the phrase "property damage ... caused by an occurrence" in the insuring agreement is construed to include "threatened damage." Insofar as appears from the reported opinion in that case, there has been no occasion to decide whether such a construction would be appropriate and that question has not been decided.
Conceivably, the evidence in the present case may ultimately show that the dioxin contamination of Diamond's property itself poses an imminent threat to someone else's property interest. If so, the trial court may have to decide whether the costs of abating that threat should be considered "sums which the insured shall become liable to pay as damages because of ... property damage" other than "property damage to ... property owned or ... to premises alienated by the named *15 insured." Perhaps there will be proof that the money which Diamond is called upon to pay is required because of the threat of imminent injury to the State's parens patriae interest in land and air. If so, the question may be presented whether such expenditures should be viewed as damages for injury to the property of another just as expenditures to protect the State's interest in a stream were in Broadwell. But for purposes of a motion for summary judgment, the record does not demonstrate beyond any genuine dispute of material fact that the damages which Diamond has been compelled to pay are damages for which it is liable because of injury to someone else's person or property, however broadly a court may construe the meaning of "property" and of "damage ... caused by an occurrence" as those terms are used in the insuring agreements between Diamond and its insurers.
Whether the State's parens patriae interest in our air, land and water is "property" within the meaning of a standard comprehensive general liability policy and whether, or under what circumstances, money which an insured is compelled to pay for the abatement of a still unrealized threat of injury to the health or property of others is recoverable under such a policy implicate "highly significant policy considerations" and, for this reason, are best decided on a full record developed at trial. Jackson v. Muhlenberg Hospital, 53 N.J. 138, 142 (1969). As we wrote in McGowan v. Borough of Eatontown, 151 N.J. Super. 440 (App.Div. 1977), by reversing the summary judgment entered in the trial court we do not imply that a plenary trial must necessarily result in a material question of fact.
We only indicate the necessity in this case of a judge making the legal determinations on which the parties' rights hinge on a full and complete record. If, on a plenary hearing, the judge finds no factual issue present or finds a moving party is entitled to judgment as a matter of law, then judgment should be entered accordingly. [Id. at 446.]
The portion of the trial court's order of February 4, 1988, from which this appeal was taken is therefore reversed and the matter is remanded for a plenary hearing. In response to the *16 argument of some of the defendants that the court should not have sought to interpret the insurance policies without considering evidence of Diamond's conduct to show how it interpreted them, we add that if competent evidence is proffered at that hearing which is material to any of the issues before the trial court, including interpretation of the contracts between the parties, we are confident that it will be received and appropriately considered. See Michaels v. Brookchester, 26 N.J. 379, 388 (1958). ("Where ambiguity exists, the subsequent conduct of the parties in the performance of the agreement may serve to reveal their original understanding."); Joseph Hilton & Associates, Inc. v. Evans, 201 N.J. Super. 156, 171 (App.Div. 1985) (Same).
We reverse and remand for further proceedings in accordance with this opinion.
NOTES
[1] E.g. Newark Building Construction Code (as amended to 1985) § 7A:5-7(a) (All buildings or structures that shall become unsafe, or unsanitary, or which contain deficient or blocked exitway facilities, or which constitute a fire hazard or are otherwise dangerous to human life or the public welfare or which by reason of illegal or improper use or occupancy, shall be deemed unsafe buildings or structures, shall be taken down and removed or made safe and secure. See Lane v. City of Mount Vernon, 38 N.Y.2d 344, 379 N.Y.S.2d 798, 342 N.E.2d 571 (1976). (City may assess cost of removing a hazardous, burned out building against a transferee of the property.)