685 A.2d 858

**AETNA INSURANCE COMPANY**

v.

**Albert G. AARON.**

**No. 187, Sept. Term, 1996.**

Court of Special Appeals of Maryland.

Dec. 3, 1996.

474

Edward C. Bacon (McCarthy, Bacon & Costello, L.L.P., on the brief), Lanham, for appellant.

Brian C. Parker (Gebhardt & Smith, on the brief), Baltimore, for appellee.

Argued before FISCHER, HOLLANDER, and EYLER, JJ.

HOLLANDER, Judge.

In this case, we are called upon to decide whether the liability portion of a homeowner's policy applies to the costs of preventative measures undertaken on the insured's property in order to prevent damage to the property of a third party. Albert G. Aaron, appellee, instituted a declaratory judgment action against Aetna Insurance Company ("Aetna"), appellant, to determine whether Aetna is obligated to defend and indemnify him with regard to a suit instituted against Aaron by his condominium association. The Circuit Court for Baltimore City (Ward, J.) granted summary judgment in favor of Aaron. On appeal, Aetna challenges that decision, asking us to consider the following questions:

1. Did the trial court err in entering summary judgment in favor of Albert Aaron on the issue of the duty of Aetna to defend the claims brought against Albert Aaron by the Council of Unit Owners of the Warrington Condominium?

2. Did the trial court err in entering summary judgment in favor of Albert Aaron on the issue of the duty of Aetna to indemnify Mr. Aaron for any judgment entered against Mr. Aaron by the Council of Unit Owners of the Warrington Condominium?

3. Did the trial court err in ordering that Aetna was obligated to reimburse Mr. Aaron for all costs and expenses, including reasonable attorney's fees, incurred by Mr. Aaron in bringing the declaratory judgment action and in defending the underlying lawsuit?

We conclude that the trial court properly determined that Aetna had a duty to defend Aaron. We also agree that, under certain circumstances, an insurer may be obligated to indemnify its insured for remediation expenses incurred in connection with the insured's property. Accordingly, we shall affirm.

### Factual Summary

In 1984, Aaron purchased Unit 1300 in The Warrington Condominium (the "Warrington"), located in Baltimore. His unit, which included a large glass enclosure (the "Glass Enclosure") installed around the balcony area, is located directly above Unit 1200. From approximately June 8, 1984 through at least June 8, 1989, Aetna issued a series of homeowner's insurance policies to Aaron (hereinafter collectively referred to as the "Policy"), which provided first-party property coverage and liability insurance with respect to Aaron's condominium unit. In particular, the Policy insured appellee against damage to his unit due to certain specified perils, and it provided coverage for certain claims asserted by third parties. The Policy stated, in pertinent part:

If a claim is made or a suit is brought against any **insured** for damages because of **bodily injury** or **property damage** to which this coverage applies, we will:

a. pay up to our limit of liability for the damages for which the **insured** is legally liable; and

b. provide a defense at our expense by counsel of our choice.

(Bold face in original.) The Policy defined "property damage" as "physical injury to or destruction of tangible property, including loss of use of this property." The Policy also included the following "exclusion" as to coverage:

2. **Coverage E—Personal Liability,** does not apply to:

\* \* \* \* \* \*

b. **property damage** to property owned by the **insured;** (Bold face in original).

In 1985, Rita St. Clair, the owner of Unit 1200, first began to experience water leaks in her condominium. The common areas of the building were also plagued by intermittent water problems. Between 1985 and 1993, various contractors attempted to resolve the leaks. Eventually, in 1993, it was determined that Aaron's Glass Enclosure was the source of the problems. Consequently, the Council of Unit Owners of The Warrington (the "Council") repaired appellee's Glass Enclosure in order to prevent further leaks into St. Clair's unit and the common areas. Thereafter, the Council filed suit against Aaron to recover the sum of $97,370.73, which represented the amount it expended to repair the Glass Enclosure. The suit alleged that Aaron was contractually obligated to repair any part of his unit that caused damage to the property of others. Based on a theory of quantum meruit, the Council also contended that Aaron was responsible for the cost of the repairs.

Aaron submitted the Council's claim to Aetna, which declined coverage. In view of Aetna's position, Aaron filed a declaratory judgment action against Aetna, seeking a determination of his rights under the Policy.

After some discovery was conducted, Aaron moved for summary judgment in the declaratory judgment action. In his motion, he contended that the undisputed facts established

that Aetna had an obligation to defend and indemnify him under the terms of the Policy and was thus also liable for his attorneys' fees, costs, and expenses in connection with the declaratory judgment action. He relied on the Policy language, which provides protection for "a suit for damages" (i.e., the Council's suit), instituted "because of ... property damage ...." (i.e., the damage to Unit 1200 and the common areas). To support his assertion, he submitted a report dated September 30, 1993 from an engineering firm retained by the Council, which concluded that water was leaking internally from the Glass Enclosure and "finding its way" to St. Clair's unit and the common elements of the building.

Aaron further argued that the Council's claim was not within the Policy's exclusion for property that he owned (hereinafter, the "owned property exclusion"), because the repairs to the Glass Enclosure were necessary to prevent imminent damage to third-party property. Aaron asserted that the repairs were undertaken to alleviate a condition with respect to his property that did not present any problem to him, but was damaging St. Clair's unit and the common areas. Alternatively, he argued that, if the factfinder in the Warrington suit determined that he did not even own the Glass Enclosure, then the owned property exclusion would not apply.

In its opposition, Aetna asserted that material facts were in dispute, making summary judgment inappropriate.[1] Further, it contended that the Council's claim was barred by the Policy's owned property exclusion, and that the claim was not "for" property damage, as defined in the Policy.

On August 9, 1995, the court issued an order granting

---

1. At oral argument, Aetna conceded that the issue concerning the duty to defend is a legal one, but claimed that factual disputes prevented resolution of the indemnity issue. *See Fisher v. U.S. Fidelity & Guar. Co.*, 86 Md.App. 322, 586 A.2d 783 (1991) (finding that if there is no dispute over facts relevant to issue of coverage, then the question of whether the policy provides coverage is for the court to determine).

summary judgment in favor of Aaron.[2]  The order stated, in part:

> [I]t is hereby determined that Aetna is liable to satisfy any judgment entered against Aaron in connection with the [Warrington suit] to the extent that the judgment is for (1) damages suffered by any third-party;  (2) damages for the cost of investigating the source of the water leak into the condominium unit located below Aaron's condominium unit; or (3) damages for the cost of making repairs or doing other work to stop the water leak or to prevent further damage to either the common elements of the condominium or the condominium unit located below Aaron's unit; . . . .
>
> \*    \*    \*    \*    \*    \*
>
> [I]t is hereby determined that Aetna shall not be liable to satisfy any judgment entered against Aaron in connection with the [Warrington suit] to the extent that the judgment is solely for property damage to property owned by Aaron, provided, however, that Aetna shall be liable for repairs to Aaron's property that were made to stop the water leak or to prevent further damage to either the common elements of the condominium or the condominium unit located below Aaron's unit; . . . .

The court also concluded that Aetna was obligated to defend Aaron in the Warrington suit and to reimburse him for the costs and attorneys' fees he incurred in connection with the declaratory judgment action.

On appeal, Aetna contends that the trial court improperly "extended" the scope of the Policy's coverage.  It maintains that the Council did not assert a claim to recover "for" property damage sustained by a third party, and that the repairs to the Glass Enclosure do not constitute "property damage", as defined in the Policy.  Central to Aetna's argument is its claim that the owned property exclusion bars

---

**2.**  Although the circuit court held a hearing on the motion, the hearing was not recorded or transcribed.

coverage under the Policy. Aaron essentially renews the arguments he asserted below.

## Discussion

### I.

Summary judgment is not a procedural shortcut to avoid a trial. Rather, it is an appropriate method of resolving cases, prior to trial, when the facts are undisputed. *Seaboard Surety Company v. Richard F. Kline, Inc.,* 91 Md.App. 236, 603 A.2d 1357 (1992). To grant summary judgment, a trial court must determine that there are no material facts in dispute, and that one party is entitled to judgment as a matter of law. Md. Rule 2–501; *see Beatty v. Trailmaster Products, Inc.,* 330 Md. 726, 737–38, 625 A.2d 1005 (1993); *Bagwell v. Peninsula Regional Med. Ctr.,* 106 Md.App. 470, 488, 665 A.2d 297 (1995), *cert. denied,* 341 Md. 172, 669 A.2d 1360 (1996); *Bits "N" Bytes Computer Supplies, Inc. v. Chesapeake & Potomac Tel. Co.,* 97 Md.App. 557, 576–77, 631 A.2d 485 (1993), *cert. denied,* 333 Md. 385, 635 A.2d 425 (1994). In the absence of disputed material facts, an appellate court will review the trial court's grant of summary judgment to insure that the trial court reached the correct legal result. *Beatty,* 330 Md. at 737, 625 A.2d 1005; *Heat & Power Corp. v. Air Prods. & Chems., Inc.,* 320 Md. 584, 578 A.2d 1202 (1990).

To defeat a motion for summary judgment, the party opposing the motion must produce evidence demonstrating that there is a dispute as to *material* facts. *Scroggins v. Dahne,* 335 Md. 688, 645 A.2d 1160 (1994). A fact is material if the outcome of the case depends on how the factfinder resolves the disputed fact. *King v. Bankerd,* 303 Md. 98, 111, 492 A.2d 608 (1985); *Keesling v. State,* 288 Md. 579, 583, 420 A.2d 261 (1980); *Miller v. Fairchild,* 97 Md.App. 324, 340, 629 A.2d 1293, *cert. denied,* 333 Md. 172, 634 A.2d 46 (1993). Moreover, the trial court must view all facts, and the possible inferences from the facts, in the light most favorable to the party opposing the motion. *Bagwell,* 106 Md.App. at 488, 665 A.2d 297.

Applying summary judgment principles, we must resolve whether the trial court properly concluded that Aetna has a duty to defend and indemnify Aaron. This task requires us to construe the scope of Aetna's liability coverage, in order to determine if the Policy extends to expenses incurred by an insured to remediate a hazardous condition on the insured's property, for the purpose of preventing imminent and further harm to third-party property. We think that it does. We conclude that, if Aaron's property caused actual damage to property of another, and there was imminent risk of additional harm if preventative measures were not implemented, and the insured had a duty to remediate, then the Policy protects the insured for the fair and reasonable costs of necessary remedial measures, but only to the extent that the repairs were not merely to benefit the insured's property. In reaching our conclusion, we focus first on the general principles that govern construction of insurance contracts.

The "duty to defend is broader than and different from the duty to pay." *Luppino v. Vigilant Ins. Co.*, 110 Md.App. 372, 381, 677 A.2d 617 (1996). An insurer has a duty to defend its insured if the claim asserted against the insured is covered, or even potentially covered, by the applicable insurance policy. *Chantel Assoc. v. Mt. Vernon Fire Ins. Co.*, 338 Md. 131, 656 A.2d 779 (1995); *Aetna Casualty & Surety Co. v. Cochran*, 337 Md. at 98, 651 A.2d 859, (1995); *St. Paul Fire & Marine Ins. v. Pryseski*, 292 Md. 187, 438 A.2d 282 (1981); *Brohawn v. Transamerica Ins. Co.*, 276 Md. 396, 347 A.2d 842 (1975); *Reames v. State Farm Fire & Cas. Ins.*, 111 Md.App. 546, 560, 683 A.2d 179 (1996). We recently said that "the analysis concerning an insurer's duty to defend a lawsuit filed against its insured . . . is governed solely by evaluating the causes of action actually alleged by the plaintiff in that lawsuit, along with the relevant extrinsic evidence." *Reames*, 111 Md.App. at 560, 683 A.2d 179; *see also Chantel*, 338 Md. at 142, 656 A.2d 779 ("[A]n insurer's duty to defend is triggered when an examination of the policy, the complaint and appropriate extrinsic evidence discloses a potentiality of coverage under the insurance coverage."); *Cochran*, 337 Md. at

107–12, 651 A.2d 859. Thus, the duty to defend arises as long as the complaint against the insured alleges "action that is *potentially covered* by the policy, no matter how attenuated, frivolous, or illogical that allegation may be." *Sheets v. Brethren Mut. Ins. Co.,* 342 Md. 634, 643, 679 A.2d 540 (1996) (italics in original).

In *St. Paul Fire & Marine Ins. v. Pryseski,* 292 Md. 187, 438 A.2d 282, the Court applied a two part test to determine if an underlying suit raises a potential for coverage under an insurance policy. The Court said:

> In determining whether a liability insurer has a duty to provide its insured with a defense in a tort suit, two types of questions ordinarily must be answered: (1) what is the coverage and what are the defenses under the terms and requirements of the insurance policy? (2) do the allegations in the tort action potentially bring the tort claim within the policy's coverage? The first question focuses upon the language and requirements of the policy, and the second question focuses upon the allegations of the tort suit.

*Pryseski,* 292 Md. at 193, 438 A.2d 282. Applying the *Pryseski* test, we must determine the extent of coverage that the Policy affords to Aaron, and whether the allegations in the Council's suit are potentially covered by the Policy.[3] *Cochran,* 337 Md. at 103–04, 651 A.2d 859.

"Under Maryland law, when deciding the issue of coverage under an insurance policy, the primary principle of construction is to apply the terms of the insurance contract itself." *Bausch & Lomb, Inc. v. Utica Mut. Ins. Co.,* 330 Md. 758, 779, 625 A.2d 1021 (1993). We begin by examining the Policy itself. The law is well settled in Maryland that an insurance policy is interpreted just like any other contract. *Collier v. MD–Individual Practice Ass'n,* 327 Md. 1, 607 A.2d 537 (1992); *National Grange Mut. Ins. Co. v. Pinkney,* 284 Md.

---

**3.** While the *Pryseski* test specifically refers to *tort* suits, and the Council's suit against Aaron sounds in contract and quasi-contract, we do not believe this distinction affects the validity or the usefulness of the *Pryseski* test.

694, 399 A.2d 877 (1979); *Bentz v. Mutual Fire, Marine & Inland Ins. Co.*, 83 Md.App. 524, 575 A.2d 795 (1990). Therefore, courts in Maryland do not follow the rule that an insurance policy must be strictly construed against the insurer. *Bausch & Lomb*, 330 Md. at 779, 625 A.2d 1021; *Cheney v. Bell National Life*, 315 Md. 761, 766, 556 A.2d 1135 (1989). *See also Hartford Acc. and Indem. Co. v. Scarlett Harbor Assoc. Ltd. Partnership*, 109 Md.App. 217, 290, 674 A.2d 106, *cert. granted*, 343 Md. 334, 681 A.2d 70 (1996). As with other contracts, a court must ascertain and effectuate the parties' intentions by analyzing the terms of the agreement. *Bausch & Lomb*, 330 Md. at 779, 625 A.2d 1021; *Cochran*, 337 Md. at 98, 651 A.2d 859; *Scarlett*, 109 Md.App. at 290, 674 A.2d 106. The language of the contract is thus the "primary source" to determine the parties' intentions. *Scarlett*, 109 Md.App. at 291, 674 A.2d 106.

In construing the language in an insurance policy, courts accord the words their usual, ordinary, and accepted meaning, unless the parties intended to use the words in a technical sense. *Bausch & Lomb*, 330 Md. at 779, 625 A.2d 1021; *Cochran*, 337 Md. at 104, 651 A.2d 859. A word's usual, ordinary, and accepted meaning is determined by the meaning that a reasonably prudent layperson "would attach to the term." *Bausch & Lomb*, 330 Md. at 781, 625 A.2d 1021; *see also Pacific Indem. Co. v. Interstate Fire & Cas. Co.*, 302 Md. 383, 488 A.2d 486 (1985). Further, the court considers the policy as a whole in determining the intention of the parties. *Nolt v. USF & G*, 329 Md. 52, 617 A.2d 578 (1993); *Finci v. American Cas. Co. of Reading Pennsylvania*, 323 Md. 358, 593 A.2d 1069 (1991); *Aetna Cas. and Sur. Co. v. Hartford Acc. & Indem. Co.*, 74 Md.App. 539, 539 A.2d 239 (1988).

If the contractual language is clear and unambiguous, we presume that the parties meant what they actually said, regardless of what they may have actually intended. *Scarlett*, 109 Md.App. at 291, 674 A.2d 106. "Where the language of a contract is clear and unambiguous, there is no room for construction and we 'must presume that the parties meant

what they expressed.' " *Shapiro v. Massengill,* 105 Md.App. 743, 661 A.2d 202, *cert. denied,* 341 Md. 28, 668 A.2d 36 (1995) (quoting *General Motors Acceptance Corp. v. Daniels,* 303 Md. 254, 261–62, 492 A.2d 1306 (1985)). Courts may consider extrinsic evidence as to the meaning of a policy term only if it is ambiguous. *Bausch & Lomb,* 330 Md. at 779, 625 A.2d 1021.

With these principles in mind, we turn to an examination of the Policy and the parties' claims. Aetna essentially denies any obligation to indemnify or defend Aaron, because the remedial measures were performed exclusively on Aaron's own property, the preventative measures do not constitute damages in Aetna's view, and the injured third party is not the one who has lodged the claim for damages. Aetna urges us to adopt a construction of the term "damages" that is limited to actual loss sustained directly by third party property. Moreover, Aetna asserts that the Council's claim for reimbursement for the cost of repairs to the Glass Enclosure is not embodied within the Policy term "for damages". Based on the owned property exclusion, Aetna would also foreclose protection for preventative measures undertaken on the insured's property to avoid prospective harm to third-party property.

Conversely, Aaron asserts that the plain meaning of the words in the Policy necessarily includes coverage for repairs to the Glass Enclosure, because the claim is "for damages because of . . . property damage." Aaron also argues that the owned property exclusion does not preclude coverage for repairs to the insured's property, if the repairs are made to prevent imminent damage to third-party property that has already sustained harm due to a dangerous condition on the insured's property.

In the area of environmental pollution, the issue of whether "response" costs or remediation expenses constitute "damages" has been extensively litigated. *Anderson Dev. Co. v. Travelers Indem. Co.,* 49 F.3d 1128, 1132 (6th Cir.1995). *See also Maryland Cas. Co. v. Wausau Chem. Corp.,* 809 F.Supp. 680, 690–1 (W.D.Wis.1992) (compiling cases). Similarly, nu-

merous jurisdictions have considered whether an owned property exclusion forecloses recovery for the costs of environmental response measures employed on an insured's own property. *Allstate Ins. Co. v. Quinn Constr. Co.*, 713 F.Supp. 35, 39–41 (D.Mass.1989). The results are by no means uniform or consistent. *Figgie Int'l, Inc. v. Bailey*, 25 F.3d 1267, 1273–74 (5th Cir.1994). *See New Jersey v. Signo Trading Int'l, Inc.*, 130 N.J. 51, 612 A.2d 932 (1992). Compare *Continental Ins. Cos. v. Northeastern Pharm. & Chem. Co.*, 842 F.2d 977, *cert. denied*, 488 U.S. 821, 109 S.Ct. 66, 102 L.Ed.2d 43 (1988) (denying recovery for clean-up costs under Missouri law) with *Independent Petrochemical Corp. v. Aetna Cas. & Sur. Co.*, 944 F.2d 940, 946–7 (D.C.Cir.1991), *cert. denied*, 503 U.S. 1011, 112 S.Ct. 1777, 118 L.Ed.2d 435 (1992) (concluding, under Missouri law, that insured is entitled to recover). *See also* Kenneth Abraham, *Environmental Liability and the Limits of Insurance*, 88 Colum. L.Rev. 942, 966–70 (1988).

In our review of these cases, it appears that, with certain limitations, environmental response costs are considered damages within the meaning of a comprehensive general liability policy. Moreover, in order to protect third-party property from imminent harm, the overwhelming weight of authority favors coverage under such liability policies for remediation expenses incurred in connection with an insured's own property, notwithstanding an owned property exclusion, when the concern is primarily addressed to the premises of a third party. *See, e.g., Intel Corp. v. Hartford Acc. & Indem. Co.*, 952 F.2d 1551 (9th Cir.1991); *Gerrish Corp. v. Universal Underwriters Ins. Co.*, 947 F.2d 1023 (2nd Cir.1991); *South Carolina Ins. Co. v. Coody*, 813 F.Supp. 1570 (M.D.Ga.1993); *Maryland Cas. Co.*, 809 F.Supp. at 696; *Chemical Leaman Tank Lines, Inc. v. Aetna Cas. & Sur. Co.*, 788 F.Supp. 846 (D.N.J.1992); *Claussen v. Aetna Cas. & Sur. Co.*, 754 F.Supp. 1576 (S.D.Ga.1990); *Boyce Thompson Inst. for Plant Research, Inc. v. Insurance Co. of North America*, 751 F.Supp. 1137 (S.D.N.Y.1990); *Allstate Ins. Co. v. Quinn Constr. Co.*, 713 F.Supp. 35, 40–41 (D.Mass.1989); *Bankers Trust Co. v. Hartford Acc. Indem. Co.*, 518 F.Supp. 371, 374, *vacated to*

*permit submission of additional evidence,* 621 F.Supp. 685
(S.D.N.Y.1981); *City of Edgerton v. General Cas. Co. of
Wisconsin,* 172 Wis.2d 518, 493 N.W.2d 768 (1992). *See also*
7A J. Appleman, *Insurance Law & Practice* § 4526 (Supp.
1995) ("If the contamination has already damaged land belong-
ing to persons other than the insured, the [owned property]
exclusion does not bar coverage of any cleanup on the in-
sured's land necessary to prevent further migration to anoth-
er's property.").

## II.

■ We focus first on Aetna's duty to defend based on
Aaron's potential liability for damages. The Council's dam-
ages allegedly resulted from the need to alleviate a hazardous
or defective condition on Aaron's property that caused earlier
damage to third-party property. Aetna's interpretation of the
Policy clause "for damages because of ... property damage"
essentially would preclude recovery for the Council's damages,
because they are consequential damages flowing from dam-
ages to St. Clair's property, not embodied within the clause.

In our view, repairs to prevent imminent and further dam-
age, whether undertaken by the insured or another, are
potentially a component or consequence of third-party proper-
ty damage. Based on the plain meaning of the Policy lan-
guage, the Council's claim to recover for the cost of such
repairs is a claim "for damages because of ... property
damage." What the court said in *Diamond Shamrock Chemi-
cals Co. v. Aetna Cas. & Sur. Co.,* 231 N.J.Super. 1, 554 A.2d
1342 (1989), is pertinent here:

> The 'owned property' exclusion does not purport to exclude
> claims because they are for sums expended for work per-
> formed within the premises owned by the insured. It
> excludes claims for sums which the insured is obligated to
> pay for 'property damage to ... property owned ... by ...
> the insured.' Claims arising out of injury to property of
> others for which the insured is responsible are covered by
> the terms of the policies even if the insured's damages are

measured in part by the cost of remedial work which has to be performed on the insured's own property.

$$* \quad * \quad * \quad * \quad * \quad *$$

*There is no novelty to the proposition that in a conventional tort action, once some present injury has been proved, the plaintiff's damages may include the cost of measures intended to prevent future injury.*

*Id.* at 12, 554 A.2d at 1348 (emphasis added).

The case of *AIU Ins. Co. v. F.M.C. Corp.*, 51 Cal.3d 807, 799 P.2d 1253, 274 Cal.Rptr. 820 (1990), is also instructive. There, the court construed the phrase "because of property damage," and concluded that all costs arising from the environmental contamination in issue occurred "because of" property damage, without regard to whether the clean-up occurred on property of the insured or on property of third parties. While the court determined that an insurer is not obligated to pay for prophylactic "measures taken in advance of any release of hazardous waste," *id.* at 843, 274 Cal.Rptr. at 846, 799 P.2d at 1279, the court said: "The provisions at issue here do not specify that coverage hinges on the nature or location of property damage. We therefore construe them to encompass damages *because of property damage in general,* regardless of by whom it is suffered." *Id.* at 843, 274 Cal.Rptr. at 846, 799 P.2d at 1279 (emphasis added).

We are also guided by the court's analysis in *City of Edgerton,* 172 Wis.2d 518, 493 N.W.2d 768, which concerned the federal Environmental Protection Agency's investigation of hazardous substances at a landfill. The court adopted a "common sense approach" with respect to whether remediation costs constitute damages. *Id.* at 542, 493 N.W.2d at 778. Quoting *Upjohn Co. v. Aetna Cas. and Sur. Co.,* 768 F.Supp. 1186, 1199–1200 (W.D.Mich.1990), the court said:

[O]nce property damage is found as a result of environmental contamination, cleanup costs should be recoverable as sums that the insured was liable to pay as the result of property damage. . . . [T]he insured ought to be able to rely on the common sense expectation that property damage

within the meaning of the policy includes a claim which results in causing him to pay sums of money because his acts or omissions affected adversely third parties. While such claims might be characterized as seeking 'equitable relief' the [cleanup] costs are essentially compensatory damages for injury to common property and for that reason the [insurer] has a duty to defend.... [T]he short answer is that from the standpoint of the insured damages are being sought for injury to property. It is that contractual understanding rather than some artificial and highly technical meaning of damages which ought to control.

*Edgerton,* 172 Wis.2d at 543, 493 N.W.2d at 778 (citations omitted).

Nor is it of any moment that the Council, rather than Ms. St. Clair, instituted suit against Aaron, or that the Council, rather than Aaron, actually made the repairs. In *Anderson Dev. Co.,* 49 F.3d 1128, for example, the insured instituted a declaratory judgment action against its insurer to obtain coverage for defense costs and indemnification as a result of a government mandated clean-up. What the court said is apt here:

It is merely fortuitous from the standpoint of either plaintiff or defendant that the state has chosen to have plaintiff remedy the contamination problem, rather than choosing to incur the cost of clean-up itself and then suing plaintiff to recover those costs. The fact that the insured cooperates and assumes the obligation to conduct a clean-up, rather than forcing the EPA to incur the expenses of a clean-up and then bring a coercive suit, does not change the bottom line that a legal obligation exists.

*Id.* at 1143.

Therefore, unless the claim is barred by some other Policy provision, the damages in issue here potentially fall within the scope of the Policy. Given that the duty to defend is broader than the duty to indemnify, we are satisfied that the duty to defend here was unequivocally triggered when Aaron was sued by the Council for damages flowing from an alleged

defect in Aaron's property that caused property damage to another. *See Edgerton,* 172 Wis.2d 518, 493 N.W.2d 768 (1992); *see also Anderson Dev. Co.,* 49 F.3d 1128 (holding that letter from EPA to insured was sufficient to trigger duty to defend).

### III.

■ We turn next to the effect of the owned property exclusion, which ordinarily bars an insured's recovery for any costs incurred to repair the insured's own property. As we observed earlier, many courts have considered the applicability of such a provision in the context of environmental cases.

In *Intel Corp. v. Hartford Acc. & Indem. Co.,* 952 F.2d 1551 (9th Cir.1991), the Ninth Circuit applied California law to construe an owned property exclusion, and determined that costs incurred to comply with a consent decree or an injunction mandating environmental cleanup, or to reimburse a government agency for cleanup expenses, constituted damages under the applicable insurance policy. *Id.* at 1563–65. The court concluded that the policy applied to expenses incurred "to mitigate any future damage that might occur . . . whether or not on [the insured's] own property." *Id.* at 1565. As the location of the source of the hazard was not dispositive, the court emphasized that the exclusion did "not bar coverage of the cost of preventing future harm to ground water or adjacent property that might arise from contamination that has already taken place, whether such contamination has occurred on [the insured's] or others' property." *Id.* Relying on *AIU Ins. Co.,* 274 Cal.Rptr. 820, 799 P.2d 1253, the court reasoned that "where an insured is covered for damage to a third-party's property, that insured would reasonably expect coverage for efforts to mitigate that damage, even when the source of the hazard is on the insured's own property." *Id.* at 1565–66.

The case of *Gerrish Corp. v. Universal Underwriters Ins. Co.,* 947 F.2d 1023 (2nd Cir.1991), is to the same effect. There, the Second Circuit concluded that a liability policy

covers a pollution claim, because environmental response costs are damages within the meaning of the policy. The court also determined that the owned property exclusion did not bar coverage, in view of damage that had occurred to property that was not owned, controlled, or possessed by the insured. The court reasoned that the insurer's liability for damage to property of another may extend to the insured's own property, "for the purpose of abating seepage to neighboring property. The cost of repairing [the insured's] property is inextricably linked" to the third-party claims. *Id.* at 1031. Therefore, the court held that the owned property exclusion did not foreclose recovery for remedial work on the insured's premises. *Id.*

■    Nevertheless, as a predicate to coverage under a liability policy for remediation expenses incurred in connection with the insured's own property, we conclude that the insured's property must first have caused damage to property owned or controlled by a third party. We are also satisfied that the insured must be legally or contractually obligated to remediate the hazard, so that the repairs are, in that sense, involuntary. In *Signo Trading Int'l, Inc.*, 612 A.2d 932, for example, the New Jersey Supreme Court determined that a comprehensive general liability policy that contained an owned property exclusion barred coverage for abatement costs in connection with threatened harm to third-party property, in the absence of prior physical injury to property of a third-party. *Id.* at 62, 612 A.2d at 938. The court recognized, however, that "the cost of measures intended to prevent imminent or immediate future damage" to third-party property is not foreclosed for coverage by the owned-property exclusion, if the third-party property has previously been damaged.[4] *Id.* at 64, 612 A.2d at

4.    In *Signo Trading*, 612 A.2d 932, the court also reviewed several earlier opinions in the New Jersey courts that confronted related issues: *Diamond Shamrock Chemicals Co. v. Aetna Cas. & Sur. Co.*, 231 N.J.Super. 1, 554 A.2d 1342 (App.Div.1989); *Summit Assoc., Inc. v. Liberty Mut. Fire Ins. Co.*, 229 N.J.Super. 56, 550 A.2d 1235 (App.Div.1988); *CPS Chem. Co. v. Continental Ins. Co.*, 222 N.J.Super. 175, 536 A.2d 311 (App.Div.1988); *Broadwell Realty Serv., Inc. v. Fidelity & Cas. Co.*, 218 N.J.Super. 516, 528 A.2d 76 (App.Div.1987), *overruled,* in part, on other

939. *See also Edgerton,* 172 Wis.2d at 546, 493 N.W.2d at 779 ("We adopt the reasoning of those courts which have held that costs incurred to prevent future pollution damage *of a kind which has already occurred* constitute 'damages' within the meaning of the standard-form CGL Policy.") (Emphasis added).

In finding the owned property exclusion inapplicable, courts have also considered the involuntary nature of the remediation measures, in the sense that they were mandated by a state or federal agency or a court order. *See, e.g., Claussen v. Aetna Cas. & Sur. Co.,* 754 F.Supp. 1576 (S.D.Ga.1990). In *Claussen,* the Environmental Protection Agency required the insured to remove hazardous materials from its property. The insurer refused to defend or indemnify its insured, because its policy did not cover damages to the insured's own property. The court rejected Aetna's argument, in part because the toxic dumping damaged not only the insured's property, but also surrounding land and water. The court also determined that coverage applied because the insured was required by the EPA to remediate the site in order to prevent damage to the property of a third party. *Id.* at 1579.

The reasoning of the court in *Patz v. St. Paul Fire & Marine Ins. Co.,* 15 F.3d 699 (7th Cir.1994) (Posner, J.) also persuades us that, for coverage to apply, the insured must have some duty to remediate, so that, the repairs may be characterized as involuntary. In *Patz,* the insureds sought to recover from their insurers for substantial clean-up costs that were incurred when a state environmental agency ordered them to mitigate toxic contamination on their own property. Because neither the groundwater nor soil contamination had spread beyond the owners' premises, the insurer asserted, *inter alia,* that coverage was barred on the basis of the owned property exclusion.

---

grounds, by *Morton Int'l., Inc. v. General Acc. Ins. Co. of America,* 134 N.J. 1, 629 A.2d 831 (1993).

Rejecting the insurer's contention that the owned property exclusion precluded coverage, the Seventh Circuit reasoned that the plaintiffs were not attempting to recover for damage to their property. To the contrary, they were seeking to recover for the cost of liability that had been imposed upon them by a state agency. In this regard, the court found it significant that the insureds *involuntarily* incurred the clean-up costs for which they sought reimbursement. *Id.* at 705.

Moreover, in that court's view, ownership of either the contaminated property or the groundwater was irrelevant. The court also deemed it irrelevant as to "how soon the groundwater contamination would have spread to groundwater beneath [the] neighbors' property if the clean up had not been ordered, whether but for the clean up the contamination ... would have leached to soil beneath the neighbors' property, or in short how much of a risk to other people's property the contamination created." *Id.* at 705. The court said:

> [The insureds] are not attempting to obtain an insurance award for a reduction in the value of, or other damage to, their land. How could they? It is a policy of liability insurance, not casualty insurance, on which they have sued. They seek to recover the cost of complying with a government order to clean up a nuisance. The fact that the clean up occurred on their land is irrelevant. For all we know, the damage to the land was much less than the cost of cleaning it up.

*Id.*

We find support in two Maryland cases for our view that third-party property must suffer actual harm caused by the insured's property, and that the repairs are not covered unless the insured has a duty to remediate. *See Bausch & Lomb, Inc. v. Utica Mut. Ins. Co.*, 330 Md. 758, 625 A.2d 1021 (1993) and *W.M. Schlosser Co., Inc. v. Insurance Co. of North America*, 325 Md. 301, 600 A.2d 836 (1992).

In *Bausch & Lomb*, the insurer sought a declaratory judgment to determine its obligations to defend and indemnify Bausch & Lomb for expenses incurred in connection with the

groundwater contamination of Bausch & Lomb's own property. The policy provided:

> The company [Utica] will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as *damages because of ... property damage to which this insurance applies* caused by an occurrence....

*Bausch & Lomb,* 330 Md. at 764, 625 A.2d 1021 (emphasis added).

Neither the State nor any adjoining landowner had sued Bausch & Lomb, notwithstanding that the contamination of the insured's property allegedly polluted a neighboring site. Because the policy as a whole covered only injury to a third party's property, and not injury suffered by the insured, the Court determined that the "question of insurance coverage turns ... on whether a third party has sustained injury to, or destruction of, its own property with respect to the [insured's] pollution." *Id.* at 783, 625 A.2d 1021.

The Court concluded that the State lacked the requisite property interest in the contaminated groundwater to "qualify as a third party whose property was damaged by the pollutants emanating from the [Bausch & Lomb] site." *Id.* In the absence of third-party property damage, it held that the insurer was not contractually obligated to reimburse its insured for the costs of alleviating damages to its own property. The Court reasoned that the "hallmark of the comprehensive general liability policy is that it insures against injury done to a third party's property, in contradistinction to an 'all risks' policy also covering losses sustained by the policy-holder." *Bausch & Lomb,* 330 Md. at 783, 625 A.2d 1021. Therefore, the insured was not required "to pay B & L's abatement expenses incurred at the State's behest." *Id.* at 788, 625 A.2d 1021.

It is noteworthy that the Court expressly declined to determine whether, if there had been third-party damage, the insurer "would have been required to pay the costs of indirect steps taken on B & L's own ... site, such as removal of the contaminated sludge, to prevent continuing harm to its neigh-

bor." *Id.* at 789, 625 A.2d 1021. This, of course, is the question that we must resolve.

In *W.M. Schlosser Co. v. Insurance Co. of North America,* 325 Md. 301, 600 A.2d 836 (1992), a subcontractor excavating a construction site was forced to backfill the excavated site to prevent the complete collapse of the earth surrounding the site and damage to a third party's property. The emergency backfilling was necessitated, in part, by the imminent approach of a hurricane. Subsequently, the general contractor, as the holder of a certificate of insurance, filed a claim with the subcontractor's insurer for the costs of the backfilling, which the insurer denied. The language of the insurance policy provided:

> If you or another *insured* has a legal responsibility to pay a claim someone made based on *bodily injury, personal injury,* or *property damage,* resulting from an *occurrence,* we will pay that claim if it is covered under this policy.

(Emphasis in original).

The Court recognized that the insured's action was "intended to prevent the type of harm the policy would have covered", but the harm had been averted by the insured's preventive action. *Schlosser,* 325 Md. at 307, 600 A.2d 836. Nevertheless, because the policy only covered damages based on third-party loss, which had not occurred, the Court held that the policy did not cover the costs of prophylactic measures on the insured's property, undertaken to protect a third-party property owner from future harm. *Id.* at 306, 600 A.2d 836. In the absence of third-party property damage, the Court concluded that a general liability policy does not cover the cost of protective measures implemented by the insured to prevent future third-party property damage. The Court declined to "make a new contract under the guise of construction." *Id.* at 308, 600 A.2d 836 (quoting *National Grange Mut. Ins. v. Pinkney,* 284 Md. 694, 399 A.2d 877 (1979)).

*Bausch & Lomb* and *Schlosser* are factually distinct from the instant matter in critical respects. In contrast to those cases, third-party property was allegedly damaged due to a

hazardous condition on Aaron's property. Moreover, in *Schlosser*, the precautionary measures of the insured were voluntarily undertaken. As we see it, if a court were to conclude that Aaron's property damaged the property of another, and that he was obligated to repair his own property in order to abate the nuisance, or to reimburse a third-party for the cost of repairs, the court's decision would constitute the functional equivalent of an agency directive.

## IV.

We recognize that the liability portion of the Policy is not intended to provide first-party protection for damage to the insured's own property. That would be a misuse of the Policy. Thus, an insured may not recover under a liability policy for any portion of remediation expenses that apply only to the insured's property. To the extent that remediation expenses reflect the cost of repairs for damage to the insured's property, unrelated to preventative measures, they are not covered. If expenses are incurred by the insured to remedy existing damage to third-party property or to prevent further damage to that property, however, there may well be coverage.

*Intel Corp.*, 952 F.2d at 1566, supports this view. There, the court noted that repair costs must be sorted into two categories: damage to third-party property and damage to the insured's property. *Id.* The court underscored that the insured was not entitled to recover costs incurred solely to remedy damage to its own property. To the contrary, coverage applied only to those costs incurred to remediate existing damage or to prevent further damage to third-party property. *Id.* Consequently, it was the responsibility of the trier of fact "to determine what expenditures were made solely to remedy damage to [the insured's] own property and which were undertaken on account of damage to the property of third parties." *Id.*

What the court said in *United States v. Conservation Chem. Co.*, 653 F.Supp. 152, 200 (W.D.Mo.1986), also provides guidance here:

[C]overage of the abatement remedy on the [insured's property] designed to prevent damage or further damage to third parties cannot be denied on the basis of the owned property exclusion. This does not, however, include elements of the claim which relate to a remedy for damage confined to the [insured's property] itself. To the extent that all or a portion of the remedy relates solely to damage to the [insured's property] itself and not to prevent off-site contamination, the 'Owned Property Exclusion' clearly applies, and such damage is not within the coverage provided.

Nor may an insured avoid his own responsibilities and obligations by seeking coverage under the liability portion of a policy. Thus, in *Patz,* Judge Posner readily agreed that an insurer is not obligated to reimburse its insured "for voluntarily undertaking to reduce potential liability ..." *Patz,* 15 F.3d at 705. To use his illustration, "The owner of an automobile cannot charge the expense of a fancy new braking system to his liability insurer on the ground that the system will make it less likely that he will injure someone in an accident." *Id.*

Under the facts of this case as they have been presented to us, however, the repairs to the Glass Enclosure were not voluntarily undertaken by Aaron. Rather, they were virtually foisted upon him. Nor was the insured attempting to avoid his responsibilities to maintain his property. To the contrary, we have found no suggestion that Aaron deliberately allowed his property to deteriorate, thereby jeopardizing the safety of third-party property, merely to come within the terms of the liability portion of his Policy. Indeed, neither Aaron nor the Council had even the slightest idea, for many years, that Aaron's property was the source of the leaks.

Nor did the repairs benefit Aaron. In this regard, it is noteworthy that the Glass Enclosure was apparently perfectly adequate from Aaron's perspective; its condition did not affect his use of it. *See Bankers Trust Co.,* 518 F.Supp. 371. Instead, the repairs were allegedly accomplished only to abate harm to property of third parties. The case of *Nationwide Mut. Fire Ins. Co. v. Banks,* 114 N.C.App. 760, 443 S.E.2d 93

(1994), is pertinent. At issue there was an accumulation of debris on the insured's property that was damaging a stream. The court found the owned property exclusion inapplicable, so that the insurer was liable to its insured for the response costs. It focused on the lack of actual injury to the insured's property from the debris, stating: "There is no indication that the debris in any way harms the land itself." *Id.* at 764, 443 S.E.2d at 96. Similarly, whatever may be wrong with the Glass Enclosure, it evidently has not interfered with Aaron's use or enjoyment of it.

## V.

Some commentators have expressed concern that, by interpreting the owned property exclusion as inapplicable to remedial measures taken on an insured's property, the courts have created a significant risk of adverse selection and moral hazard,[5] which arguably will disrupt the insurers' abilities to account for expected payouts and potentially threaten the availability of general liability insurance policies. *See* Kenneth S. Abraham, *Environmental Liability and the Limits of Insurance*, 88 Colum. L.Rev. 942 (1988). Abraham points out:

> Insurers incorporate the owned property exclusion to avoid the dangers of adverse selection and moral hazard. When insurers can rely on the exclusion, they may be able to insure against cleanup expenses and damage to owned property through other types of policies or through separate endorsements to the basic policy. When courts void the owned-property exclusion, they run the risk of creating adverse selection and moral hazard problems sufficiently

---

**5.** The term moral hazard refers to the increased risk that the insured will allow the destruction of its insured interest, or fail to take preventative measures to protect its insured interest, once it has obtained insurance, so that the insurer will pay for damages. *See* 8 George J. Couch, *Couch on Insurance* § 37A:292 (rev. ed.1985). "Adverse selection occurs when applicants for insurance possess substantially more information than insurers about the level of risk the applicants pose." Kenneth Abraham, *Environmental Liability and the Limits of Insurance*, 88 Colum. L.Rev. 942, 946 (1988).

severe that general liability insurance becomes much more expensive or much less available.

*Id.* at 967–68. *See also* George L. Priest, *The Current Insurance Crisis and Modern Tort Law,* 96 Yale L.J. 1521 (1987) (arguing that expanded third party coverage and restrictions on exclusions reduce the pool of insureds and cause an increase in insurance costs and a reduction in insurance availability). Although we understand the concern that the prevailing interpretation of the owned property exclusion may lead to increased adverse selection or moral hazard, we reiterate that there is not even a hint in this case that Aaron's actions constituted either adverse selection or moral hazard.

Conversely, the denial of coverage might encourage an insured to permit a condition on his land to deteriorate to a point that it would result in damage to others, for which liability coverage probably would be available. Anticipatory remedial measures would probably prevent damage or loss to the property of others, and reduce the likelihood of a significant claim for damages against both the insured and his or her insurer.

A number of courts have adopted the rationale that an "ounce of prevention is worth a pound of cure." For example, in *Allstate Ins. Co. v. Quinn Constr. Co.,* 713 F.Supp. 35 (D.Mass.1989), the court determined that the policy applied to work performed on the insured's property in order to prevent costly prospective harm to the property of third parties. It reasoned that if the cost of clean-up were not recoverable,

the insured would have the incentive simply to allow the pollution to continue. Under that scenario, the insurance company would ultimately have to spend much more to clean up the resulting actual damage to the property of third parties. For these reasons, the court concluded that the clean-up was as a matter of law within the coverage of the liability policy, which it construed to

*Id.* at 40 (citing *Bankers Trust Co. v. Hartford Acc. & Indem. Co.,* 518 F.Supp. 371, 373–74 (S.D.N.Y.1981)).

The court also recognized the purpose of a comprehensive general liability policy as consistent with coverage for pollution clean-up expenses incurred to prevent injury to property of others. "In some cases, the property owner will have no first-party insurance; he should not forfeit coverage by promptly cleaning up contamination rather than waiting for it to cause serious environmental damage." *Quinn*, 713 F.Supp. at 41. Reasoning that the cost of prevention is "far more economical than post-incident cure ...", *id.*, the court stated that it "serves no legitimate purpose to assert that ... pollution must be allowed to spread over boundary lines before [it] can be said to have caused the damage to other people's property which liability insurance is intended to indemnify." *Id.*

Similarly, in *Broadwell Realty Serv., Inc. v. Fidelity & Cas. Co.*, 218 N.J.Super. 516, 528 A.2d 76 (1987), the court concluded that an insured's expenses in implementing preventive measures in response to a state agency's directive constituted damages that were not barred by the owned property exclusion. The court said:

It would be folly to argue, under such circumstances, that the insured would be required to delay taking preventive measures, thereby permitting the accumulation of mountainous claims at the expense of the insurance carrier. Stated another way, the policy does not require the parties to calmly await further catastrophe. Abatement measures designed to prevent the continued destruction of adjacent property are plainly compensable under the policy.

*Id.* at 526, 528 A.2d at 76.

Nevertheless, in *Schlosser*, 325 Md. at 308, 600 A.2d 836, the Court rejected liability coverage on the basis of an argument that, if the insured failed to institute precautionary measures, the threat of imminent harm would have materialized, that harm would have been covered under the policy, and it probably would have been more costly than the preventative measure. *Id.* Therefore, we do not ground our holding on the basis that, if left unattended, the hazardous condition on the

insured's property would inevitably result in serious damage to the property of another, for which the insurer probably would be liable.

We are, however, mindful that sound public policy considerations support findings of coverage in the special context of environmental pollution cases. *See, e.g., South Carolina Ins. Co. v. Coody,* 813 F.Supp. 1570, 1578 (M.D.Ga.1993); *Patz v. St. Paul Fire & Marine Ins. Co.,* 817 F.Supp. 781, 784 (E.D.Wis.1993) ("the area of environmental damage presents unique questions for insurance coverage because there is always the potential that contamination will spread. As a policy matter, it is more desirable to take remedial action as soon as possible, rather than waiting until off-site environmental harm has occurred."), *aff'd,* 15 F.3d 699 (7th Cir.1994); *Quinn,* 713 F.Supp. at 41 (observing that environmental pollution cases are "unique").

*Polkow v. Citizens Ins. Co. of America,* 180 Mich.App. 651, 447 N.W.2d 853 (Mich.App.1989), rev. on other grounds, 438 Mich. 174, 476 N.W.2d 382 (1989) is instructive. The court determined that the owned property exclusion was inapplicable because of a broad government interest in protecting the environment. Recognizing that the alleged pollution fell outside of the policy exclusion for damage to an insured's property, the court said that the allegations "are essentially for injury to the public interest in the well-being of the environment and natural resources of this state." *Polkow,* 180 Mich. App. at 659, 447 N.W.2d at 857.

Similarly, in *Bankers Trust Co.,* 518 F.Supp. at 374, the court observed that, if the owned property exclusion applied, an insured would continue to pollute, "causing further social damage and damage to third parties, and ironically costing even [the insurance company] more money." It determined that the imminent danger to property of another constitutes damage within the meaning of the insurance policy. *Id.*

We are unpersuaded that the special considerations applicable to environmental cases render the underlying bases of those decisions invalid here. As we see it, an owned property

exclusion does not necessarily bar coverage of a claim for remediation expenses. Whether the Policy here ultimately will provide coverage necessarily depends on a resolution of various factual questions, including the following: 1) Did the third party property actually suffer damage that was caused by property defects or hazards on the insured's property? 2) Were the repairs to the insured's property necessary to prevent imminent, additional damage to the third party property? 3) To what extent, if any, did the cost of repairs relate to repairs solely for the benefit of the insured's property? [6]

As we have noted, the Council's suit alleged that the condominium and St. Clair sustained third-party property damage due to defects in the Glass Enclosure, and that the repairs were necessary to prevent imminent and further damage to that property. The suit also alleges that the Council incurred costs of $97,000 to repair Aaron's property. We are satisfied that the trial court's order fairly outlines the basis on which Aetna may be liable to Aaron.

## VII.

The trial court determined that the costs of investigation constitute a category of damage for which Aetna is responsible. Under certain circumstances, an insured may be liable for the costs of investigation and, if so, the insurer may be required to indemnify its insured for such expenses. At this juncture, we express no opinion on the merits of the claim regarding the costs of investigation. We observe, however, that the investigation apparently lasted years and was largely unsuccessful. The record does not indicate who investigated or why it took so long to identify the source of the problem. On this record, it would appear that the Council would not be entitled to reimbursement for the costs of investigation. In the absence of Aaron's obligation to reimburse the Council, the insurer would not be liable.

---

6. Appellant advises us in its brief that the Council's suit has settled. We express no opinion on the effect of the settlement with regard to the factors that we have identified.

In contrast, the rule is clear that if an insured must resort to litigation to force its insurer to perform its duty to defend the insured and provide liability coverage, then the insured may recover the fees, costs and expenses of the litigation. *Nolt v. USF & G,* 329 Md. 52, 617 A.2d 578 (1993); *Campbell v. Allstate Ins.,* 96 Md.App. 277, 624 A.2d 1310 (1993) *rev'd. on other grounds,* 334 Md. 381, 639 A.2d 652 (1994); *Continental Casualty Co. v. Board. of Educ.,* 302 Md. 516, 489 A.2d 536 (1985); *Bankers & Shippers Ins. Co. v. Electro Enter.,* 287 Md. 641, 415 A.2d 278 (1980); *Cohen v. American Home Assur. Co.,* 255 Md. 334, 258 A.2d 225 (1969). As we have determined that the trial court correctly found that Aetna had a duty to defend Aaron, the trial court also properly directed Aetna to pay Aaron's fees, costs, and expenses in connection with the declaratory judgment action.

Finally, we note that Aetna argues that it has no duty to defend or indemnify Aaron, because the Council incurred the repair expenses in 1993, and Aaron's Policy expired in 1989. Aetna concedes that this argument was not raised below. Therefore, it is not properly before us on appeal, and we decline to consider it. *See* Md. Rule 8–131(a).

SUMMARY JUDGMENT AFFIRMED.

COSTS TO BE PAID BY APPELLANT.